## Page *et al.* versus Allen *et al.*

## Robb *et al.* versus Barlow *et al.*

1. The Act of April 4th 1868 (Registry) is unconstitutional.

2. The interest of a taxpayer where money is to be raised by taxation or expended from the treasury, entitles him to test in equity the validity of the law which proposes the taxation or expenditure.

3. The inhibitions of the constitution as to legislation are to be regarded as well when they arise by implication as by expression. This is the case where the legislation is repugnant to some provision of the constitution.

4. The expression of one thing in the constitution is the exclusion of things not expressed.

5. Exceptions strengthen the force of a general law, and enumeration weakens it as to things not expressed.

6. The constitution is to be understood in its plain untechnical sense.

7. For the orderly exercise of the rights of voters under the constitution the legislature must prescribe necessary regulations as to whatever may be required to insure its full and free exercise : but the regulation must be subordinate to the right.

8. No constitutional qualification of a voter can be abridged, added to or altered by legislation.

June 3d 1868.   Before THOMPSON, C. J., STRONG, READ, AGNEW and SHARSWOOD, JJ.

These were two bills brought to July Term 1868, in the Supreme Court for the Eastern District, sitting in equity.

Their object was to test the constitutionality of the Registry Law of the 4th of April 1868.

The first was by James Page and others, citizens and voters of the commonwealth and residents in Philadelphia against James Allen and sixty-four others, Aldermen of the city of Philadelphia, to whom were afterwards added by amendment, Joseph N. Peirsol, Treasurer, and Joseph R. Lyndall, Controller of the city.

The other bill was by Charles Robb and others, citizens,' &c., against Thomas A. Barlow and others, members of the Select Council of Philadelphia; George W. McTague and others, members of the Common Council, David P. Weaver and others, City Commissioners, and the above-mentioned Treasurer, Controller and Aldermen.

The bill sets out :—

1. The passage of the act.

2. That the first 11 sections and the first paragraph of the 12th provide a system of registration of voters, throughout the commonwealth, which sections, although repugnant to the constitution, are modified by devolving the duties on officers chosen for assessment and election duties, representing a majority of their constituents in their election districts, but that the 12th and subsequent sections, in violation of section 5, article 3 of the constitution, enact an unequal discrimination against electors in Phila-

delphia, by limiting the right of voting to voters named in lists by canvassers selected on political grounds, for the purpose of excluding citizens whose names shall not appear on the lists, although they may be qualified voters.

3 and 4. That by section 12 the aldermen of Philadelphia are made a board to appoint three canvassers for each election district, all of whom shall not be of the same political party; and that there are 65 aldermen and 266 election divisions. The act therefore provides for an election by a political vote of 798 canvassers who are to be paid $5 per day each, &c.; averring that the aldermen are not elected to appoint canvassers, &c.

5. That by the 13th section the canvassers shall meet on the first Monday of September in each year, at the place of holding elections in said divisions, and on that and the next two days make a list of persons known to them to be qualified electors, who have voted at any preceding general election therein; that the canvassers shall make affidavit that the list " is a true list of the voters in said election division, who have theretofore voted in said election divisions, so far as the same are known to them;" that copies shall be posted with a notice that the canvassers will meet on the 12th day preceding the general election, and for two days ensuing to correct and complete the lists.

6. That a majority of the canvassers may exclude from voting, without appeal, such citizens as they may choose; that the voters placed on the list are limited to those of whom they have personal knowledge, excluding evidence of witnesses; that thereby the number inscribed on the list will be so few, and the additions to be made at the subsequent meeting so numerous and the impediments so great, as to make it physically impossible that voters should all have an opportunity of voting.

7, 8 and 9. That by the 14th section the canvassers are to meet on the 12th, 11th and 10th days before the general election, and correct the list by striking off those who have died or removed, and adding any one who shall prove himself a qualified elector; the latter shall produce a voter as a witness of his residence for a period of ten days before the election, and the witness shall subscribe an affidavit, &c., and the last meeting being on the 10th day preceding the election, it is impossible then to ascertain whether a claimant has resided in the district ten days before the election.

10. That the residence of ten days before the election, &c., qualifies the claimant, which could not be proved till the day of the election, and the provisions of the act requiring a decision before the fact exists and imposing an infamous punishment, prevent that and are unconstitutional.

11. That the provision of the 15th section that the lists shall

[Page *v.* Allen.]

be delivered to the officers of the election ten days before the election, and shall be the only evidence of the claimant's right, is unconstitutional as it would exclude voters who had resided in the district ten days, and were not on the list.

12 and 13. The 14th section further provides that the claimant shall make an affidavit as to the time and place of his birth, and if naturalized when and by what court, and present his certificate of naturalization, unless he has been a voter in the district five years and has resided in the Commonwealth one year, or if having removed therefrom has resided six months before the election, has not moved into the division for the purpose of voting, and has not been registered elsewhere; that these provisions are unconstitutional because they deprive voters of their votes unless their names are on the list, require them to subscribe an affidavit, add onerous duties to the canvassers, impose burdens of written affidavits with time so limited that the right of suffrage is put in peril, obstructed and denied; that the constitution does not require any voter's name to be put on a list, and therefore by implication it is forbidden; that the act preventing a citizen enjoying the qualifications in the constitution, from voting because his name is not on the list; that requiring the affidavit of a claimant that he is a citizen of the United States and of Pennsylvania, would exclude citizens between twenty-one and twenty-two years, who have resided in the state one year and the district ten days from voting, and that requiring the claimant to present his certificate of naturalization to the board of canvassers, are void.

14. That the 15th section provides that receiving a vote from persons not so proved to be qualified shall be a misdemeanor in the election officers; that this is against the 3d article of the constitution, tending to prevent qualified persons from voting and threatening the officers; laying down other qualifications than the constitution, requiring proof which in many cases is physically impossible; requiring claimants to make affidavits and produce a witness who shall make affidavit of the right to vote, &c.; that on completing the list after 7 o'clock on the tenth day preceding the election, the canvassers shall make four copies of the list, one for the canvassers who shall immediately assess a tax on every one in the list, and by reason thereof the tax cannot be assessed till after the tenth day before the election.

15. That the 17th section provides for similar requisitions in relation to the election for electors for President, and there is no provision in the act in regard to persons sick or otherwise unavoidably prevented.

16 and 17. That by the act a voter cannot enjoy the rights of an elector unless a political majority of the canvassers shall insert his name, &c., and the right of suffrage of those in the lists

[Page v. Allen.]

of the canvassers is further restricted by the judgment of a central board of aldermen.

18. That a similar act has been construed by a former legislature to be unconstitutional.

19. Sets out the citizenship and residence of the plaintiffs and qualification as voters, interested in the maintenance of the constitution and the selection of officers by whom they are to be governed and taxed, and their fear that they and other voters shall be deprived of the right of voting at the next and subsequent elections, &c.

20. That the aldermen (defendants) are to constitute the board of appointment of canvassers.

The bill was amended by adding averments that the plaintiffs are taxpayers in Philadelphia, and the act will subject the city to an illegal burden of more than $60,000 in the current year.

The averments and allegations contained in the other bill are substantially as in the first.

The prayers were for an injunction restraining the defendants from exercising the powers under the Act of Assembly, or decree declaring the act unconstitutional, &c.

The act provides,

1. That the assessors shall make a list of white freemen over twenty-one years known or claiming to be voters, and opposite their names shall state whether they are housekeepers, and if so, their number, street, &c.; if no numbers, the streets, &c., and occupation; place of boarding if the claimant be not a housekeeper; if naturalized exhibit his certificate unless he has voted in that district five years, and opposite his name shall be put N.; if he has only declared his intention, D. I.; if between twenty-one and twenty-two years, " Age;" and a tax shall forthwith be assessed against the person; the assessors shall, on or before September 1st, ascertain the qualifications of claimants to vote and furnish a list to the commissioners and election board afterwards created.

2. The assessor shall, before August 1st, place a copy of the list at the place of voting and retain one for inspection, and on personal application add any one claiming a right to vote and assess him on the tenth day preceding the election; and the assessor shall produce the list to the inspectors and judges at a meeting thereafter directed.

3. The inspectors, judge and assessor shall meet at their place of election on the tenth day before the election to hear proof as to the right to vote of persons on the list, or who shall apply to be registered, and persons who have not previously voted in the district or not on the list shall prove their right; they shall then be assessed, and copies of the completed list shall be made out and posted, &c.; they shall meet also on the Thursday before the election to receive further applications for registry of those who

[Page *v.* Allen.]

make affidavit that they were prevented from being registered before, and on similar proof shall have their names put on the list; and if on or before the election he will be between twenty-one and twenty-two years, and has resided in the state one year and the district ten days, he shall be registered; receiving the vote of a person not so registered shall be a misdemeanor in the election officer, and subject him to fine or imprisonment, &c.

4. Persons on the list may be challenged at the election, and naturalized citizens shall produce their certificate and the same proof of right to vote, as is now required, must be produced by the claimant, the officer shall endorse on the certificate "voted," with the month and year, and for voting or receiving a second vote the same day, there shall be punishment by fine and imprisonment.

5, 6 and 7. Provide for preserving the registry list and for registering in a similar manner, before the presidential election, voters not on the list; and also for special elections.

8. Provides for qualification of assessors and election officers and their compensation, and forbids assessors to assess any one within ten days of an election, under a penalty not exceeding $100, and imprisonment not exceeding three months.

9. On allegation on oath of the fear of fraud, the court shall appoint overseers who shall be present during the holding of the election, &c., may challenge, &c.

10. Prothonotary, &c., sealing, &c., a naturalization paper, so that it may be fraudulently used, &c., shall be fined and imprisoned.

11. Provides for punishment of assessors and election officers acting contrary to the provisions of the law.

12. Foregoing provisions not to apply to Philadelphia. The aldermen of Philadelphia to be a board to meet the first Monday in June and organize, and or before the first Monday in August appoint as canvassers three citizens of each district, who shall not all be of the same political party.

13. The canvassers shall meet at their places for holding elections on the first Monday in September, and upon that and the two next days shall make a list of those whom they know to be qualified electors, who have voted at any preceding general election therein, and shall state whether said elector is a housekeeper, and if he be, the number of his residence and occupation; and where not a housekeeper, his occupation, place of boarding and with whom. The canvassers to swear to the lists, and give a list to the city commissioners, board of aldermen, and return one; the lists to be posted by the commissioners, with a notice that the canvassers will meet the twelfth day before the election for correcting the lists.

14. Canvassers shall meet on that day at the place of election in their district, and for two days then next, and strike off the

name of any person known or found to have died or removed, and add any one who shall prove himself to be a qualified elector. They shall remain in session from 10 A. M. till 7 P. M. The person claiming shall produce one voter of the division as a witness of his residence ten days before the general election, of which the witness and the claimant shall make affidavits; if naturalized, claimant shall state when and by what court, and shall "present his certificate of naturalization for examination, unless he has been a voter in said election division for five years then next preceding the ensuing general election, that he has resided in this commonwealth one year, or if formerly a citizen therein and has removed therefrom, that he has resided therein six months next preceding said election, that he has not moved into the division for the purpose of voting therein, and that he has not been registered as a voter elsewhere."

15. On completing the lists they shall make out four copies, and give one to the assessors who shall immediately assess a tax on all the persons therein, give the list to the commissioners who shall give a sufficient number of copies to the receiver of taxes, &c.; and the only evidence of such person's residence in such division for ten days before election shall be that his name is found thereon; receiving the vote of any person not so proved, shall be a misdemeanor in the election officers, and on conviction thereof they shall be subject to a fine not exceeding $300, and imprisonment not exceeding one year.

Any qualified citizen may challenge at the polls a voter on the list, who shall make the same proof as is now required by law, and naturalized citizens shall produce their certificates.

16. Provides for preserving the lists.

17. Provides for registering voters before the presidential election the same as in reference to the general election.

18, 19, 20. Provide for qualifying canvassers and election officers and their compensation, and for the expenses of carrying out the law.

21. Repeals all inconsistent laws.

*G. W. Biddle* and *W. L. Hirst*, for Page *et al.*, plaintiffs, referred to Chase *v.* Miller, 5 Wright 403; Com. *v.* Maxwell, 3 Casey 461; Catlin *v.* Smith, 2 S. & R. 267. Registry laws which exist in Rhode Island, New York, Louisiana and Florida are recognised in their constitutions. Under the Massachusetts, Maine and New Hampshire laws names may be added on the morning of the election and after voting commences: Waite *v.* Woodward, 10 Cushing 143; Bacon *v.* Benckley, 3 Id. 100; Capen *v.* Foster, 12 Pick. 485.

*F. Sheppard* and *H. M. Phillips*, for Barlow *et al.*, plaintiffs,

[Page *v.* Allen.]

referred to Sharpless *v.* Philadelphia, 9 Harris 167; Mott *v.* Penna. R. R., 6 Casey 24; Ewing *v.* Thompson, 7 Wright 379; Kerr *v.* Trego, 11 Id. 295, as to plaintiffs' equity.

As to right of courts to declare an act unconstitutional: Cronise *v.* Cronise, 4 P. F. Smith 255; Jones *v.* Jones, 2 Jones 350; Eakin *v.* Raub, 12 S. & R. 330; People *v.* Johnson, 6 Cal. 499. The Act of 1868 is unconstitutional: Chase *v.* Miller, Commonwealth *v.* Maxwell, *supra ;* Brown *v.* Hummel, 6 Barr 86; Commonwealth *v.* Mann, 5 W. & S. 420; Leib *v.* Commonwealth, 9 Watts 200; Kelly *v.* State, 6 Ohio, N. S. 269; 3 Debates in Convention of Pennsylvania 77, 157. Judicial officers can be compelled to perform none but judicial acts: Hayburn's Case, 2 Dall. 410; Kuhn *v.* Bank U. S., 2 Ashm. 173; Penn Square Case, MS.; Griffith *v.* Cochran, 5 Binn. 87; Commonwealth *v.* The Judges, 3 Binn. 275.

*W. B. Mann* and *W. H. Rawle,* for defendants.—As to the equity of plaintiffs: Sharpless *v.* Phila., *supra ;* Frewin *v.* Lewis, 1 Mylne & Cr. 254; Hill *v.* Kensington, 1 Parsons 501.

The legislature has jurisdiction in all cases not prohibited: Weister *v.* Hade, 2 P. F. Smith 477; Commonwealth *v.* McCloskey, 2 Rawle 374; Commonwealth *v.* Hartman, 5 Harris 119; Kirby *v.* Shaw, 7 Harris 200; Sharpless *v.* Philadelphia, *supra ;* Booth *v.* Town of Woodbury, 32 Conn. 118; Bank *v.* Brown, 26 N. Y. (Ct. of App.) 469; Baker *v.* City of Cincinnati, 11 Ohio St. Repts. 543; Lehman *v.* McBride, 15 Id. 591; Morrison *v.* Springer, 16 Iowa 304; Nogues *v.* Douglass, 7 Cal. 69.

As to the constitutionality of a registry law they referred to the registry laws of Massachusetts, Maine, New Hampshire, Rhode Island, New York, Louisiana and Florida: Capen *v.* Foster, *supra ;* Davis *v.* School District, 44 N. Hamp. 404; Auld *v.* Walton, 12 Louis. Ann. 141.

They referred also to the "Frame of Government," Penna. 1796; Acts of 1705, 1724, 1745, 1766, 1785; Constitutions of 1766 and 1789; Act of 1799, Purd. (Ed. 1818) 150; Registry Law of June 16th 1836, Pamph. L. 602. The aldermen can be compelled by mandamus to act: Lamb *v.* Lynd, 8 Wright 336; Chase *v.* Miller, *supra.* A law whose effect is to disfranchise a voter is not for that very reason unconstitutional: Huber *v.* Reilly, 3 P. F. Smith 116.

The opinion of the court was delivered, July 2d 1868, by

THOMPSON, C. J.—The first of these bills was filed by the plaintiffs, residents, taxpayers and qualified voters of this city, against the defendants, the aldermen of the city, to restrain them from exercising certain powers and authority in their aggregate capacity; which, it is alleged, they claim to be conferred upon

[Page v. Allen.]

them by the provisions of an Act of Assembly, passed April 4th 1868, entitled " A further supplement to the act relating to the elections of the commonwealth," and from appointing or attempting to appoint canvassers as directed in and by the said act; or from interfering or intermeddling with, or obstructing or attempting to obstruct, the qualified voters of this commonwealth, by any act or means whatever, from the enjoyment of the rights of electors secured to them by the constitution of the commonwealth. The second bill is to the same effect by parties possessing like qualifications, and including as defendants the members of Select and Common Councils of the city, the City Commissioners, Controller and Treasurer of the city, as well as the Aldermen.

These bills question the constitutionality of the Act of Assembly referred to, and familiarly known as the " Registry Act," and charge, among other matters, that a large sum of money will be required from the city treasury to put the act into operation, which, as taxpayers, they are interested to prevent, and which would be wholly misapplied, the act being, as they allege, unconstitutional and void. The right of the plaintiffs to interfere on these grounds was not disputed, neither do I think it could have been at any time since the decision in Sharpless v. The Mayor, &c., 9 Harris 147, and Moers v. The City of Reading, Id. 188. In both, it was conceded that the interest of a taxpayer, where money was to be raised by taxation, or expended from the treasury, was sufficient to entitle him to proceed in equity to test the validity of the law which proposed the assessment or expenditure. To this effect is Mott v. The Pennsylvania Railroad Co., 6 Casey 9. That we have power to enjoin the respondents has not been disputed. The cases of Kerr v. Trego, 11 Wright 292, Irving v. Thompson, 7 Id. 379, if authority were wanting, would be sufficient for this.

The power of this court and its duty to declare an Act of Assembly unconstitutional, if it be plainly so, is no more to be doubted than its power to declare an instrument of writing void for want of due execution. This power is not disputed. What shall be the test of want of constitutional sanction, is a question of more or less difficulty in all cases involving it. It is usual on the part of those who insist on the constitutionality of any given statute, to claim that it must be regarded as constitutional, unless expressly prohibited by some provision in the constitution. In other words, in construing the constitution of the state, whatever is not expressly denied to the legislative power is possessed by it. The opposite of this rule, I may remark, is the rule of construction of the Federal Constitution. I assent to this, but not that the inhibitions of the constitution must be always express. They are equally effective, and not less to be regarded, when they arise by implication, and this is the case when the legis-

[Page *v.* Allen.]

lative provision is repugnant to some provision of the constitution, 9 Watts 200 ; 5 W. & S. 424 ; 12 S. & R. 330 ; 3 Casey 444 ; 5 Wright 403. To illustrate this idea : The executive power of the state under the constitution is lodged in a governor, and the legislative in a senate and house of representatives. It would be manifestly repugnant to these provisions of the constitution if an Act of Assembly should provide for the election of two executives, or two senates and houses of representatives at the same election ; yet it would be unconstitutional only by implication, there being no express prohibition on the subject. So in regard to qualification for office. . An act which should require a residence in the state for ten years, instead of three, or an age of fifty years, or freehold estate, in order to be eligible to the office of representative, would be void for repugnancy, because differing from the qualification expressed in the constitution, and would be so only by necessary implication ; necessary to keep legislation within the paramount rules of the constitution. The expression of one thing in the constitution, is necessarily the exclusion of things not expressed. This I regard as especially true of constitutional provisions, declaratory in their nature. The remark of Lord Bacon, "that, as exceptions strengthen the force of a general law, so enumeration weakens, as to things not enumerated," expresses a principle of common law applicable to the constitution, which is always to be understood in its plain, untechnical sense : Commonwealth *v.* Clark, 7 W. & S. 127.

These instances illustrate the principle of the authorities, which hold, that acts repugnant to the constitution are void by implication, and at the same time they also illustrate the inquiry in the case in hand, whether this act is constitutional.

In Article III., Section 1. The constitution declares, " In elections by the citizens, every white freeman of the age of twenty-one years, having resided in this state one year, and in the election district where he intends to vote ten days immediately preceding such election, and within two years paid a state or county tax, which shall have been assessed at least ten days before the election, shall enjoy the rights of an elector ; but a citizen of the United States who had previously been a qualified voter of this state and removed therefrom and returned, and who shall have resided in the election district, and paid taxes as aforesaid, shall be entitled to vote after residing in the state six months. Provided, That white freemen, citizens of the United States, between the ages of twenty-one and twenty-two years, and having resided in the state one year, and in the election district ten days as aforesaid, shall be entitled to vote, although they shall not have paid taxes."

These are the constitutional qualifications necessary to be an elector. They are defined, fixed and enumerated in that instru-

[Page v. Allen.]

ment. In those who possess them is vested a high, and to freemen, sacred right, of which they cannot be divested by any but the power which established them, viz.: The people, in their direct legislative capacity. This will not be disputed.

For the orderly exercise of the right resulting from these qualifications, it is admitted that the legislature must prescribe necessary regulations, as to the places, mode and manner, and whatever else may be required, to insure its full and free exercise. But this duty and right, inherently imply, that such regulations are to be subordinate to the enjoyment of the right, the exercise of which is regulated. The right must not be impaired by the regulation. It must be regulation purely, not destruction. If this were not an immutable principle, elements essential to the right itself might be invaded, frittered away, or entirely exscinded under the name or pretence of regulation, and thus would the natural order of things be subverted by making the principle subordinate to the accessory. To state is to prove this position. As a corrollary of this, no constitutional qualification of an elector can in the least be abridged, added to, or altered, by legislation or the pretence of legislation. Any such action would necessarily be absolutely void and of no effect. We hold, therefore, what indeed was not expressly denied, that no regulation can be valid which would have the effect to increase the district, or state residence, prior to the time of an offer to exercise the right of an elector, or which would impose other or additional taxation or assessments, than those provided in the constitution.

With these principles in view, we are to inquire how far the provisions of the Act of Assembly in question, conflict, if at all, with the provisions of the constitution on the subject of the qualifications and rights of electors. Before proceeding to this, however, I must remark, that the regulations in the act are materially distinct and different in the other portions of the state from those proposed and intended for this city. I have not time or room in this opinion to point them out. A very cursory reading of the act will suffice to show it. In the city they are more complex, and consequently render the chances of registration, in my opinion, more difficult and precarious. For myself, I think a material diversity of regulation, not the result of locality merely, but of policy, between different parts of the state, is itself, a violation of the guaranty in the bill of rights, that " elections shall be free and equal" to all those possessed of the designated qualifications. If policy, and not locality or physical necessity, be allowed as reasons for a great diversity of regulation, the political bias of a section might become the pretext for the complication of regulations, in order to enjoy the rights of an elector, so as to be destructive of the right itself. If all the citizens are within the equal protection of the provision quoted, that

" elections shall be free and equal," then they are subject only to such diversities as grow out of locality alone, in my judgment, not to increased trouble and expense in establishing their qualifications or uncertainty in doing it.

But to proceed with the inquiry proposed above : In answer to the argument that the legislature could not, constitutionally, authorize the aldermen of the city, to act as a board for the purpose of appointing boards of canvassers, because they might not be willing to act, we think the contingency referred to hardly sufficient to produce such a conclusion.   We are not prepared to say at this time, that they might not be compelled to assemble and act. It is not likely, however, that they would ever refuse.

It is provided in the act, that the board of canvassers in the several districts, shall not be constituted all of one political party. As there is no obligation on any one to adhere for any definite length of time to a professed preference for any political party, the rule or qualification is utterly uncertain in its nature, and, to a great extent, in practice.   In times of great excitement and political changes, the rule would exist but in name, while in fact it might not exist at all.   It is a proffer of fairness so far as diversity of political sentiment is concerned, without the slightest assurance that it will be so in fact.   We cannot, however, correct unwise legislation, and we see nothing in it repugnant to any constitutional provision and it is not expressly prohibited.

But considerations more directly affecting the questions of the case claim attention.   The 13th and 14th sections of the act, prescribe the duties of the canvassers most important to be considered in this inquiry, and these provisions will therefore demand some particularity of notice.

In the first place, the canvassers for the election districts in the city, to be appointed by the board of aldermen, as provided in the 12th section, are required to meet in their respective districts on the first Monday of September, annually, and on that and the two ensuing days "make out an alphabetical list of all such persons as they *shall know* to be qualified electors, who have voted at any preceding general election," &c., designating therein whether the voter is a housekeeper or boarder, and his occupation, and with whom he boards, if not a housekeeper.   When this list shall have been completed, it is to be subscribed and sworn to by the canvassers, or a majority, and three copies made, one to be delivered to the city commissioners, one to the board of aldermen, and the third to be retained by the board of canvassers.   This list the city commissioners are, on its receipt, to have immediately printed and posted in at least two places in the district, with a " notice thereon, that the boards of canvassers will meet at the places of holding the general elections, on the twelfth day preceding the general election day, and for two days then next ensuing, for the purpose

[Page v. Allen.]

of revising, correcting, adding to and subtracting from and completing the list." It will be observed that in making out the primary list, only those citizens are to be registered who are known to the board to be qualified electors "who have voted at some preceding election." How this fact is to become known to the board other than personally, is not provided for, and, of course, is left to them to determine. Doubtless it would naturally be construed as resting in their personal knowledge exclusively, as they are bound to make oath to the list as the list of voters known by them. I see not how any other construction is possible, in the absence of any authority to receive evidence of the fact from any other source. On this construction, and I think it the true one, the primary list would necessarily be small, with every disposition to fairness on the part of the board. The personal knowledge of each member would not be likely to extend to any great number of voters; but when the concurrent knowledge of a majority is required, it is fair to presume, if they be conscientious men, that the primary list, in any district, would be but a small proportion of the actual number of constitutionally qualified voters.

This being so, numbers, probably a majority of the electors in many districts, would, in order to be registered and entitled to vote, be obliged to apply to the canvassers, who are to meet on the twelfth day before the day of holding the general election, and on that and the two following days between the hours of 10 A. M. and 7 P. M., of each day, make the proof required by section 14 of the act, in order to procure registration. The provisions on this subject are as follows:

"Each person so claiming to be entitled to vote therein, shall produce at least one qualified voter of said division, as a witness, of the residence of said claimant in said division for the period of at least ten days, next preceding the general election then next ensuing; which witness shall take and subscribe an affidavit to the facts stated by him; which affidavit shall define clearly the residence of the person so claiming to be a voter; and the person so claiming the rights to be registered, shall also take and subscribe an affidavit stating *where he was born;* that he is a citizen of this commonwealth and of the United States; and if a naturalized citizen, *shall* also present his certificate of naturalization for examination, unless he shall have been a voter in such election district for five years then next preceding the general election then next ensuing; that he has resided in this commonwealth one year, or if formerly a citizen therein, and has removed therefrom, that he has resided therein six months next preceding the general election then next following; that he has not moved into the division for the purpose of voting therein; that he has not been registered as a voter elsewhere; which said affidavits, both

[Page *v.* Allen.]

of the claimant and his witness shall be preserved by the canvassers."

The time for revising this list is to be closed at 7 o'clock P. M. on the evening of the tenth day preceding the general election. Then the canvassers are required to make four copies of the revised list; one for the board of aldermen, which is to be accompanied by the affidavits of the applicants and witnesses ; one to the assessors of the ward, who shall *thereupon immediately assess* a tax according to law, upon *every person* whose name is contained on said list, and deliver the same to the city commissioners, who shall cause a sufficient number of copies to be printed for the use of the receiver of taxes, one of which they shall deliver to the judges and inspectors of election of the division ; and as to this list section 15 provides thus : " The only evidence that such person has resided in such election division for ten days next preceding such election, shall be the fact that his name is found thereon as hereinbefore provided ; and the reception of the vote of any person not so proved shall constitute a misdemeanor in the election officers so receiving it, and on conviction thereof the election officers so offending shall be subject to a fine not exceeding $500, and imprisonment not exceeding one year, at the discretion of the court."

How it is possible after 7 o'clock P. M. of the tenth day before the election day, that four lists of the voters of the division, especially in heavy districts, can be made out in time for the assessors of the ward to assess a tax on *every person* whose name appears on the list, as registered, by the act, before 12 M. of the night of the tenth day before the election, even supposing them bound to be in attendance at some particular spot for the purpose, which they are not, is certainly not easy to comprehend; and without all this be done, the elector must be deprived of his right to vote. Notwithstanding his name might be on the list, still the act requires assessment in all such cases to complete registration. If that should be wanting the process would not be complete; he would not be entitled to vote as a necessary result. This must be so, or the required assessment of all persons whose names were to be placed on the revised list was intended for an unnecessary, idle ceremony. This we are not to suppose. It would require a great degree of credulity to believe that hundreds, nay thousands, of voters in the city would not be deprived of their constitutional rights of electors by this process, abridged in time for execution, as we have shown it would be. The accumulation of affidavits, not oaths merely—the attendance on the board of canvassers, it may be, day after day (for the act contemplates that there may be required three days to revise the list), in hearing applicants for registration, the necessary application by the voter to be assessed, which if made at all cannot be earlier than in the night time of

the last of the ten days, after the list shall have been made out; the subjection to the assessment of a tax to complete the process, whether the voter may have previously thereto been assessed, or even paid taxes or not, and the knowledge that after all this, voters will at the polls be subject to be challenged, and all that has been required and proved may have to be proved again—for the fact of registration is conclusive of nothing, it is only its absence which is conclusive, and that against the citizens—are such a succession of embarrassments, if nothing more, as to be equivalent in many cases to a denial of the right of the elector altogether; an overthrow of the guaranty of the constitution, that "elections shall be free." I fully subscribe to what was said by the court in the case of Commonwealth *v.* Maxwell, 3 Casey 444: "A law intended to take away, or unnecessarily postpone or *embarrass*, the right of election would be set aside as unconstitutional." This principle is effected by any unnecessary embarrassment of the rights of the elector. Nor is the evil distinguishable between the consequences of an act intended to embarrass, and one that does embarrass unnecessarily without intending it. In my judgment, this view, if there was nothing else to complain of, ought to set aside this act.

But there are more obvious and clear violations of the constitutional rights of electors in the provisions of the section quoted; and as to these a majority of us fully concur, and mainly rest this decision.

The constitution requires a previous residence, when the citizen offers to vote, of ten days in the district. The act requires ten days residence in order to be admitted to registration, and proof to be made at least ten days before election day. This is a plain requirement of proof of twenty instead of ten days, as required by the constitution. The words of this provision are peculiar. They are: "The person so claiming to be entitled to vote, shall produce at least one qualified voter of the said division as a witness, of the residence of said claimant in said division for the period of at least ten days next preceding the general election next ensuing." The witness is to prove a fact which has transpired at the time he subscribes the oath, namely, a residence of ten days. He is not to swear to facts that might raise a presumption that the elector would reside in the district ten days immediately preceding the election, but to depose to his knowledge of actual residence; and that nobody can do unless it has taken place. If, therefore, the witness could affirm to only nine days' residence in the district when called before the canvassers, the *right of registration* would not be made out, and although on election day the citizen may have resided nineteen days in the district, he would be deprived of his vote because not on the list. The absence of his name there, is made conclusive against his right. The law, as it stands in regard to proof of residence before the board

[Page *v.* Allen.]

of canvassers, is incapable of being administered in any other way. No witness would be hardy enough to swear to a residence which had not transpired. It is incapable of proof, and yet it is required.

In The Commonwealth *v.* Cornish, 6 Binn. 249, it was held that a witness, undertaking to swear to a fact of which he had no knowledge, is guilty of perjury, although the fact might turn out to be true.

It was admitted on argument by one of the learned counsel for the respondents, and who also admitted an agency in preparing the act, that as it stood it was a mistake—" a blunder"—but he proposed no remedy which we are competent to adopt. We cannot say that the canvassers shall receive other evidence than that required by the act. In short, it is not possible to prove the constitutional term of residence before it has taken place. If, as suggested, the name appearing on the registry ten days before the election were intended to be evidence that the voter was a resident in the district at the time of registration, why was proof required of any time before the day of registration? And if on that day, of course it would be no evidence of continued residence up to the day of election, as required, and would be an idle ceremony merely. The view urged is impossible to be entertained, because the express provisions of the section will not admit of it, and besides, no opinion of any court could insure uniformity in the boards of canvassers on this point, even if the views suggested were possible to be adopted.

Precisely the same difficulty extends to the cases of persons coming to reside in the state, or of returned citizens. Each must anticipate the period of constitutional qualification by ten days' residence more than is required by its provisions; that is to say, they must prove the constitutional requirement complete, in order to be registered, ten days before exercising the right of voting. This adds to that qualification ten days. One year and ten days in the one case, and six months and ten days' residence in the other, is the requirement of the act. The proof cannot be made before the board of canvassers in any other way, in accordance with the act, and in this way the requirement is clearly violative of the constitution, which concedes the right to vote if the period of residence be complete at the moment the offer to vote is made.

In regard to persons entitled to vote on age: supposing any provision for registration in favor of that class exists at all, which is doubtful, the proposed voter is to prove, by a qualified voter of the district, his right before it has accrued, if it happens that he will arrive at age less than ten days before the day of election. According also to the terms of the act such a voter, if placed on the revised list, would be subject to be assessed. All on that list

are to be assessed—there are no exceptions. This is in direct conflict with the constitution.

In the case of naturalized citizens, whose naturalization papers shall be procured less than ten days before election, they will necessarily be prevented by the act from exercising the rights of electors, because the exhibition of complete naturalization papers to the canvassers ten days before election is indispensable in order to registration. It must be remembered that, according to the act, under no circumstances whatever can any qualified citizen exercise the right of an elector, unless his name be on the registration list ten days before the election, without subjecting the election officers to fine and imprisonment. Thus all such citizens would be excluded. What shall be the proof on which sons of naturalized citizens are to be registered, is not stated, and of course their rights to registration will depend on the discretion of the canvassers, and be accepted or rejected at pleasure.

It seems inevitable that in all cases where the voter's qualification becomes complete, according to the constitution, only within ten days before any general election, he cannot be registered from inability to make the proof required by the act, and consequently will be deprived of his right to vote if the act be sustained as constitutional. For these reasons a majority of us concur in holding the act unconstitutional, and of course void. We cannot declare it partially void, because of the special provisions applicable to the city of Philadelphia. Were we so to hold, and were it possible to sustain the balance of the act, it would leave in force the repealing clause which repeals all laws inconsistent with the act, and thus Philadelphia would be without election laws, and her citizens disfranchised. This we cannot do. It must exist as an entirety or not at all. Indeed, independently of this consideration, the same objections exist to the proof necessary to be made in order to registration in other portions of the state, where the names are omitted from the primary lists of the assessors, and application has to be made to be registered, that exist in the 14th section, as applicable to Philadelphia, to which we have referred at length. This clearly appears in the 2d and 3d provisions to the 3d section of the act.

I admit that unwise, and even unfair legislation, if such a thing could be imputed to any act of the legislature, is not necessarily void; yet peculiarities in legislation may be a reason for critical investigation. In examining the act in question, I could not but remark, that although it abounds in penalties, especially in that portion applicable to the city, against violations of its provisions by voters, witnesses and election officers, yet there are none denounced against boards of canvassers for wrongfully refusing to register a voter who may have met every requisition in order

8 P. F. SMITH—23

[Page *v.* Allen.]

to entitle him to be registered. His security the act assumes to be in the oath of the individuals composing the board.

This ought to be sufficient. But the attempted change of the election laws, has its strongest, if not only reason, in the assumption, in some instances no doubt just, that official oaths have been insufficient under existing laws to guard against cheating and frauds in elections. What reason there is to expect that they would be better observed under the new law, is not apparent. No higher qualification for the office of canvasser is required than for a judge or inspector of an election board. The same results may therefore be as reasonably anticipated in the one case as in the other. The securing of fairness is not improved in the provisions on the subject, most certainly.

But I will not follow this train of thought further. I agree that it is always a grave matter to set aside an act of the legislature, and I doubt if there is any instance of its having been done where the people have asked by petition for legislation. They are careful of their constitutional rights. In the case in hand, which is an act of the greatest public consequence, the "Daily Legislative Record," an official publication of the legislative proceedings, gives no account of petitions of the people for the great change of law attempted; or, so far as the city is concerned, that the act was the work of any committee; but it does show that the provisions of it were ostensibly the work of a single member, presented to the House in manuscript, and without having been printed, passed that House without debate. In this shape it went to the Senate, where it was almost immediately agreed to without the allowance of debate or printing. This may well account for the incongruous and unconstitutional features of the act. These facts, however, have had no weight whatever in producing the result at which we have arrived. They might well stimulate the activity of the scrutiny exercised in examining the provisions of the act, but they had no other effect.

I have not specially noticed the citation of authorities by the counsel for respondents, to prove that registration laws have been held constitutional by the courts of other states. This may be owing to the peculiarities of the constitutional provisions of those states; but another reason exists for not noticing them. We do not mean at this moment to decide that no constitutional registration law can be enacted. For myself I think there might be, and possibly in such form as to protect the rights of all legal voters, and secure the people, to some extent at least, against the possibility of fraud at the ballot-box. Be this, however, as it may, we are not ready to assent to the act in question as of this character, or within the power of the legislature to pass. This conclusion leaves all the election laws in force which were intended to be superseded by this act. Their provisions are well understood.

[Page v. Allen.]

They have been in operation many years, with but comparatively few complaints, not resulting from the laws themselves so much as from the want of integrity in administering them.   This the penalties of the law should remedy.   Elections under these laws will therefore impose no hardship, or do any wrong to the people, if conducted as the law requires, and it is in this spirit we ought to expect them to be executed.   For these and other reasons which might be given, a majority of us think that the injunction prayed for in each of the bills, should be granted, on the complainants each entering bail in the sum of $1000, to be approved by the court or a judge thereof.

STRONG, J.—A registry law might be framed under our constitution.   Such a law is desirable.   I see but one objection to the constitutionality of the Act of 1868.   It is, that it deprives of a vote those who may move into an election district more than ten days prior to an election, but less then twenty.   In this particular alone the act is unconstitutional.

AGNEW, J., dissenting.—The purpose of these bills is to restrain, by injunction, the aldermen, councils, commissioners, controller and treasurer of the city of Philadelphia from carrying into execution any part of the act for the registration of electors, passed the 4th of April 1868.   They assume that the entire law is unconstitutional and void.   The general scheme of the act is this: The aldermen of the city are constituted a board for the appointment of three persons called canvassers, who shall not all belong to any one party, for each election division of the city.   It is the duty of the canvassers to meet on the first Monday in September in each year, and make out a list of all the qualified electors known to them in their respective divisions.   They then subscribe and make oath to these lists.   The lists are to be printed and posted in at least ten places in each election division, together with a notice of the next meeting of the canvassers to revise, correct and complete the lists.   That meeting is required to be on the twelfth, eleventh and tenth days next preceding the day of the general election, and is to continue from 10 o'clock A. M. until 7 o'clock P. M. of each day.   At this meeting it shall be the duty of the canvassers to add to their lists the names of all who claim to be registered as .voters, on proof by one witness, himself a qualified elector, of the residence of the claimant within the division, for a period not 'later than ten days before the day of the election; and on the oath of the claimant himself, of the time and place of his nativity, that he is a citizen, and has resided in the state one year, or in case of removal and return, six months previous to the day of the ensuing election; and also that he has not moved into the division for the purpose of voting therein, and

[Page *v.* Allen.]

has not been registered as a voter elsewhere. Thus the law provides for an impartial commission to register the voters, for ample time and opportunity for each elector to be registered down to the last business hour of the last day, when a voter may move into a district and claim his vote. The list as first made must contain all the known voters, and being made on oath, of course will be taken from proper and legal sources of information, to wit, the last list of voters and former register, and must be finally revised, corrected and completed on proper evidence. The board of aldermen, men generally of standing, and elected from all parties, are not likely to appoint canvassers of bad character. The canvassers being reputable resident citizens, not confined to any one party, and acting under the sanction of an oath to the truth of their lists, are not likely to fail to make them correctly; and if from accidental causes a few legal voters should be omitted, it is more than compensated by the multitude of illegal voters who are excluded.

What could be more fair than this mode of ascertaining the legal voters of the commonwealth? It denies to no one any right secured to him by the constitution, and secures to the true electors, first, their own right, and then the value of their ballots, by preventing neutralization by means of frauds. If the right of an elector be valuable, surely that system is most just which secures it from depreciation. The majority rule, when believed to be honestly administered, carries with it a moral power far beyond the sway of kings. But as a principle, it depends on the confidence begotten by it. The moment it is thought to be tainted with fraud, and the will of the true majority not faithfully expressed, distrust, dissension, and disturbance will follow. Confidence is lost, the essential principles of free government are endangered, evil passions inflamed, and peace destroyed. The remarks of the late John Sergeant, President of the Constitutional Reform Convention of 1837, in the debate on the 3d article, are felicitous and to the point: "We could not make a system so perfect that it should do no injustice to any one in the course of its operation; but he believed, under the present system, where one man properly entitled to vote was excluded, ten men voted who were not entitled to. Do you mean to have any limit at all? Do you intend to draw no line between your resident citizens, and vagrants and transient persons? If not, then let the judges and inspectors of elections take every vote that is offered, even without any name at all. Let every one go and vote, first in each of the fifteen wards of Philadelphia, and afterwards in Southwark and Spring Garden." John Sergeant was one of Philadelphia's ablest and noblest sons. What, then, can be more honest, fair and just, than a system which ascertains who are the actual resident voters on the tenth day before the election? Is there any one who can

desire to benefit by the frauds to which the ballot-box is exposed by striking down this protection?

A registry law is constitutional. It has been well said that a constitution cannot execute itself. An outline, like the frame of a house, it is unfit for use until it is built and fitted up by the carpentry of the law. The constitution declares that in elections by the citizens, every white freeman (having the prescribed qualifications) shall enjoy the rights of an elector. But who are the citizens, and how and where shall they vote? When, in what manner, and by whom shall their citizenship, identity and qualifications be ascertained? All these are unwritten in the constitution, and are therefore left to legislation. Excepting the day of the general election, and the qualifications of the electors, the whole subject lies absolutely within the domain of legislative power. The entire machinery of elections, and the evidence of the identity and qualifications of electors, are now regulated by law. What is there to prevent the repeal of one system and the substitution of another? A chief duty under our system of government, is to ascertain who are the qualified electors. It is as clear a breach of the constitution to admit unauthorized persons to vote, as to exclude legal electors. A just registry of the electors is therefore constitutional and necessary, as a proper means of identifying those who offer their votes, and " calculated to promote peace, order, and celerity in the conduct of elections." Being within the scope of undoubted legislative power, unless its provisions plainly and palpably (I adopt an approved form of expression) infringe the fundamental law, this court cannot arrest its execution. The nature of this proceeding demands a proper consideration of its true character. We are asked to place a judicial veto upon an entire system. No suitor is before us complaining of any provision in it affecting his own right of suffrage, but we are asked at the instance of private parties, to strangle the whole law, by restraining the board of aldermen from appointing the canvassers. This strikes down the entire system in all its parts. Who asks this to be done? Not the board of aldermen. They have met, and are ready to proceed to perform their duty, if we will permit them. But private citizens, as yet uninjured, and never likely to be, complain, and inform us that the aldermen are judicial officers, and the legislature ought not to impose this duty upon them.

But what is this to them? If the aldermen are willing, what right has one to say nay? It is time enough for a court of equity to interpose, when the aldermen complain of an invasion of their rights. Is the act of a judicial officer, performed under the express authority of law, absolutely void, merely because it is not strictly judicial in its nature? This is the very point we must decide before we can enjoin against the act, at the instance of these private parties. To assert that the exercise of such powers is a

[Page *v.* Allen.]

void act, would be to overturn the legislation and received practice of nearly a century, making void the most solemn acts of judicial officers. Not only all our own appointments of prison, penitentiary and building inspectors, and other officers committed to our selection are absolute nullities, and the acts of these persons invalid, but we, who ought to know this, have been guilty of periodical violations of the constitution we have sworn to support. There is also a vast field of appointment not alluded to by counsel, which, if contrary to the constitution, yet accompanied its birth, and has continued to this hour without the slightest suspicion of any want of authority—one on which the administration of civil affairs depends in a high degree. The Courts of Common Pleas and Quarter Sessions fill all vacancies in county and township offices, such as commissioners, auditors, surveyors, district attorneys, constables, supervisors, overseers of the poor, &c. For many years the associate judges constituted a part of the board for the revision of the taxes, and the judges of the judicial districts appointed the revenue commissioners. To these may be added what I might term the semi-judicial appointments of commissioners to lay out and divide townships, road viewers, &c.

Who has ever doubted the right of judges or justices, at least at their own option, to perform functions of this character, when expressly authorized by law? Are we then, by the strong hand of power, to overturn this long-settled practice, at the instance of mere private parties? Nothing, it seems to me, but the wildest notions of equity or law could suggest such a proceeding—notions having their parallel only in the argument that we ought to stop the aldermen from proceeding at all events, because, possibly, they might all decline to act. It is sufficient for us, however, that the aldermen have met, and have adjourned only out of respect for our process. If this injunction be supported, the next step we may expect will be, on the death or resignation of a district attorney, the disinterested citizens of our commonwealth, who are under recognisance or indictment to answer for supposed offences, will ask us to enjoin the judges, as judicial officers, from filling the vacancy. And to carry out the wholesome principle of preventing judicial officers from performing such duty, we may arrest the affairs of any unfortunate county or township, that may lose its officers by death, resignation or removal.

The next objection to this law is even more unfounded. It is said the law requires the aldermen to appoint canvassers from the different political parties, and it is therefore a partisan measure. This is not so. They are to appoint "three reputable citizens for each election division of said city, *all* of whom shall *not* be of the *same* political party." They are not to appoint all of one party, but where does the law say they shall appoint partisans at all? What good man who desires to see fair dealing and to pre-

[Page v. Allen.]

serve the purity of the ballot-box, can object to this? What one of these complainants would applaud a speaker who would constitute a committee upon elections wholly of members of his own party? The objection is a perversion of the text of the law, and is disingenuous. The only qualifications of the canvassers are that they shall be reputable resident citizens, and they need not belong to any known party, but if they do they shall not all belong to the same party. This is fair and just to all.

If the board of aldermen be restrained upon such pretexts, what then? It is said the old law is revived, though expressly repealed. But does this follow? The repeal of a repealing law revives the former law, for this is the specific intent and necessary effect of the repeal of a repeal. But here we have a substitute *and* a repeal. When the substitute falls, not by legislative repeal, but a judicial decree, how is the old law revived? Certainly not by our act, for we exercise no legislative power. We say the substitute is invalid, but can we say the former law shall be reinstated? This requires legislative power.

Objections have been taken to the duties prescribed for the boards of canvassers. It is said the law confines the formation of the lists of voters at their first meeting to the *personal* knowledge of the canvassers. The law uses no such language. They are to make out " an alphabetical list of all such persons as *they shall know to be qualified electors who have voted at any preceding general election therein.*" How are they to know? By having been at the polls and watched the persons depositing their ballots? This is the only means of a *personal* knowledge. But this meaning is clearly absurd, and cannot be imputed to the legislature. They are to know *who have voted as qualified electors* at any preceding general election by the usual means of knowledge, to wit, the lists of voters. When the law gets into operation there will be no difficulty in knowing who are the qualified electors, so as to make out a very full and nearly complete list, as they will have the former register as well as the list of voters, in addition to their own knowledge of the persons in their divisions. One of the meanings given by lexicographers to the word " know" is, " to be informed of :" Webster, Worcester. The objection is hypercritical and groundless.

The lists having been completed at the first meeting, as far as the means of knowledge of the canvassers would then admit of, they are required to meet again to revise and correct the list, by striking off the names of all persons ascertained to be deceased or removed, and by adding the names of others, who shall, " to their satisfaction, in conformity with the provisions of the act, prove themselves to be qualified electors of said election division." We have now reached the most vehement objection. It is said the proof required of the person claiming to be added to the list

[Page *v.* Allen.]

is impossible or else absurd, and imposes a disqualification contrary to the terms of the constitution. In order to state this question fairly and show the groundlessness of this complaint, I shall quote this part of the law: "Each person so claiming to be entitled to vote therein, shall produce at least one qualified voter of the said division as a witness of the residence of said claimant in the said division for the period of at least ten days next preceding the general election then next ensuing, which witness shall take and subscribe an affidavit to the facts stated by him, which affidavit shall define clearly the residence of the person so claiming to be a voter; and the person so claiming the right to be registered, shall also take and subscribe an affidavit stating where and when he was born, that he is a citizen of the Commonwealth of Pennsylvania and of the United States, and if a naturalized citizen, he shall also state when, where and by what court he was naturalized, and also present his certificate of naturalization for examination, unless he has been a voter in said election division for five years then next preceding the general election next ensuing; that he has resided in this Commonwealth one year, or if formerly a citizen therein and has removed therefrom, that he has resided therein six months next preceding the general election then next following; that he has not moved into the division for the purpose of voting therein, and that he has not been registered as a voter elsewhere; which said affidavits, both of the claimant and his witness, shall be preserved by the canvassers."

A fair-minded man, it seems to me, cannot fail to perceive the meaning of this provision, though awkwardly expressed. The claimant must prove his actual residence in the election division, and this residence must have existed at least ten days (the constitutional limit) before the election which is to ensue. It may be as much more as the party can prove, but it must have commenced at least ten days before the election. The canvassers are required to sit for three days in succession, the last being the tenth day before the election, and to remain in session until seven o'clock in the evening, the latest business hour, and the latest period when any one can be reasonably expected to remove into the district. The claimant has therefore until dusk of the tenth day before the election, to bring his witness, and prove his removal into the district. The purpose of the law in requiring the witness of the residence to state also, that it is for a period not less than ten days before the next election, was no doubt to prevent fraudulent proofs, by adjournment over within the ten days; or by equivocal or general expressions, which would leave the time when the residence commenced, uncertain. A fair survey of the section will show that *residence* is the subject of proof, the important fact to be clearly ascertained. The language is, "A witness of the residence of said claimant"—and the affidavit "shall define clearly

the residence of the person so claiming." The *period* of residence plainly means the time at which it *dates*, or begins to run. The witness testifies to a residence of at least ten days previous to the election. The first meaning attributed to this clause by the plaintiffs, to wit, that the claimants shall prove a residence in the district of ten days previous to taking the oath, is in the teeth of the words themselves, which are, "For a period of at least ten days *next* preceding the *general election* then next ensuing." How is it possible to say that a period of ten days∘ *next preceding the day* of election means a period of ten days *previous to taking the oath*. The argument does not pretend to assert that the words read in this way, but that they mean this, because the witness cannot swear to a future period of time. Certainly he cannot; but for this very reason we should construe the law to mean what it evidently intends, to wit, that the residence, which he does swear to, actually existed at least ten days before the election. To assert that the legislature meant to require proof of a residence ten days before taking the oath, when the words do not say so, but do say next preceding the election, is to set up a meaning, it seems to me, and then to strike down the law for having it. No law can stand such a test, and I know no approved rule for thus interpreting statutes. The other meaning attributed to this clause, to wit, that the witness must swear to a residence of ten days between the time of taking his oath and the day of election, is plainly absurd, and therefore not to be adopted by a court, whose duty it is to interpret a law by the rules of common sense, and so as to effectuate the intention of the legislature. No man possessing ordinary intelligence could have penned this clause, with this absurd meaning. He must have known in the first place that the thing is impossible, the time not having expired, and that no witness, unless an idiot, would swear to a fact that had not yet transpired. He must have known, in the next place, that such a provision would nullify the law, and this could not have been his design. We cannot suppose the legislature meant a thing both impossible and suicidal, especially when a very sensible and obvious meaning is presented by the words themselves. The true meaning is made more evident by the subsequent provision in the 15th section, "That the only evidence that such person has resided in such election division for ten days preceding such election, shall be *the fact that his name is found thereon*"—to wit, the register. The fact of registration on the proof of a residence, *pre-existing ten days* before the election, is thus made conclusive evidence of continued residence in the mean time. Clearly this does not exact harder terms than the constitution requires. It substitutes registration (on the oath of a witness), made twelve, eleven, and not less than ten days before the election, for proof, on the day of election, of a continuous residence commencing ten days before.

[Page *v.* Allen.]

It thus furnishes a legal presumption, that one having a bonâ fide residence in the district from the tenth to the twelfth day before the election, has continued therein until he offers his vote.    This is a mere regulation of the evidence of residence, clearly within legislative power.   If we follow the light of authority also, we cannot fail to interpret this law according to its true sense.   Certainly we ought not to impute absurdity in order to defeat the statute.   "When the intention of the legislature or the law is doubtful, and not clear, the judges ought to interpret the law to be what is most consonant to equity, and least inconvenient:" 1 Dallas 188, citing Vaugh. 28, 285.   "As to the construction of statutes, it is certain they are not always to be construed according to the *letter:*" 3 Binn. 356.   "Or," has been construed to mean " and :" 8 W. & S. 463.   "Void," has been held to mean "voidable:" 2 W. & S. 280.   And in this case Justice Sergeant said, "But for us to hold a law unconstitutional, it must be a *plain* violation of some provision contained in the constitution."   And thus said Justice Strong, in Huber *v.* Riley, 3 P. F. Smith 315, " It is the duty of every court to construe a statute, if possible, so, *ut res magis valeat quam pereat*, that construction of this act must be adopted, which is in harmony with the acknowledged powers of Congress."   The whole difficulty in reading the act before us, is removed by substituting the preposition " at" for "for," reading the clause " *at* the period of at least ten days next preceding the general election," instead of "*for* the period," &c.   Nothing is more common than the misuse of prepositions and conjunctions, and, indeed, of adverbs, in all kinds of writings, statutes as well as contracts and wills.   These parts of speech are the mere links of thought, and we are in the daily habit of changing such minor expressions into their correct forms, *ut res magis valeat quam pereat*.

A kindred criticism is applied by the objectors to that portion of the affidavit of the claimant reading as follows: " That he has resided in this Commonwealth one year," or, in case of removal and return, " that he has resided therein six months next preceding the general election then next following."   It is said this means the claimant must swear that he *will* reside therein until the day of the election, in order to complete the one year or six months; and this he may not safely do.   If it means that he has resided a year or six months before the date of the oath, it would require a longer residence than the constitution prescribes.   Yet the language expresses no such thought, and certainly does not mean it.   It merely says, "he *has* resided one year or six months next preceding the general election," and means simply, that the period of residence *runs back* to a period of one year or six months before the election.   The day of election is stated only for the purpose of computing the time *backward*, not forward.   The registration on the tenth or twelfth day before the election, stands,

[Page *v.* Allen.]

as before stated, for the evidence of continued residence down to the election. Indeed, I do not see how it is possible to miss the meaning of this provision.

The next objection scarcely deserves notice. On the completion of the lists of electors, a copy is to be handed to the assessors, "who thereupon shall immediately *assess a tax according to law* upon *every* person whose name is contained in said list, and deliver the same to the city commissioners." It is thought this will subject to double taxation. This is not correct. This act provides neither for what taxes shall be assessed nor how they shall be collected, leaving the kind of tax, the appeal, the collection and all matters relating to it, to be regulated by the general laws. The assessor is plainly remitted to the general law, to govern himself accordingly. The list is handed to him in the last of September or first of October, after the taxes of the current year have been assessed and gone into collection. He is the same assessor who is to assess the next year's tax. The assessment is plainly, therefore, a part of the assessment of the same fall for the next year's tax, and the evident purpose of this act is to secure the proper assessment of each registered voter every fall. It is for this reason *every* registered person is to be assessed, and the list to be returned to the commissioners, who carry it into the approaching assessment, and must take care that no one is doubly assessed; and if he be, he has his remedy by appeal, at the usual time and place.

It is also objected that the list is handed over to the assessors too late to make the assessment ten days before the election. But as the purpose, as already stated, was to furnish a system for taxing all the electors every year, it is evident this provision was not intended to supply the means of assessment for untaxed electors in time for the ensuing election, and therefore does not supply the old law which exists for this purpose. Those, therefore, who have not paid a tax within two years, can still avail themselves of the old law, and procure themselves to be assessed ten days before the election, and thus entitle themselves to vote as heretofore. It is also to be borne in mind that the assessment is no part of the registry, and that one whose name is registered can therefore vote on any payment of taxes within the constitutional provision.

But were all these objections to the proceedings before the canvassers to be conceded, what right have we, at the instance of these plaintiffs, to restrain the board of aldermen? The injunction should issue against the canvassers only, to restrain them from executing that portion of the law we may deem to be invalid. Clearly they have a right to make out lists, and erase and correct them by proper legal evidence. If they undertake to make witnesses swear to impossibilities, or the party to swear to a future

[Page *v.* Allen.]

residence, or to do any illegal act, the remedy belongs to the injured party, and lies against the canvassers, and not against the aldermen. The appointment of the canvassers is clearly a valid act, and if disputable, certainly no one but the aldermen themselves can complain of the duty exacted. This is a wholesale proceeding against everybody—aldermen, councils, and city officers—as if the legislature had no power to regulate the subject of elections at all.

What right have we as a court to set ourselves against the whole system, a matter within the undoubted power of the legislature? We are not a counsel of censors to revise legislation, but our whole duty is performed when we redress the wrong of a party injured by some invalid portion of the law. The system is charged with expensiveness, but the remedy for this lies with the people themselves and their representatives. The question of a registration is not a new thing. It was thoroughly investigated, and decided to be a valid exercise of legislative power, in Capen *v.* Foster, 12 Pickering 485. The opinion of Chief Justice Shaw is one of marked ability, and I cannot do better than to transcribe the following paragraphs:—

"The constitution, by carefully prescribing the qualifications of voters, necessarily requires that an examination of the claims of persons to vote on the ground of possessing these qualifications, must at some time be had by those who are to decide on them. The time and labor necessary to complete their investigations, must increase in proportion to the increased number of voters, and, indeed, in a still greater ratio in populous commercial and manufacturing towns, in which the inhabitants are frequently changing, and where of necessity many of the qualified voters are strangers to the selectmen.

"If, then, the constitution has made no provision in regard to the time, place and manner in which such examination shall be had, and yet such examination is necessarily incident to the enjoyment and exercise of the right of voting, it constitutes one of those subjects respecting the mode of exercising the right, in relation to which it is competent to the legislature to make suitable and reasonable regulations, not calculated to defeat or impair the right of voting, but rather to facilitate and secure the exercise of that right."

"And the court is of opinion that the provision in the general law regulating elections, and that in the act incorporating the city, which requires that the qualifications of voters shall be *previously offered and proved* in order to entitle them to vote, that their names shall be entered upon an *alphabetical list or register of voters*, is highly beneficial and useful, calculated to promote peace, order and celerity in the conduct of elections, and as such to facilitate and secure this most precious right, to those who

[Page v. Allen.]

are by the constitution entitled to enjoy it; that it cannot be justly regarded as adding a new qualification to those prescribed by the constitution, but as a reasonable and convenient regulation of the mode of exercising the right of voting, which it was competent to the legislature to make; and therefore that these legal enactments, not being repugnant to the constitution, are valid and binding laws, to which both voters and presiding officers at elections are authorized and bound to conform.

"Nothing but the carelessness or neglect of the voter himself, or some accident not attributable to the law or the officers who are to execute it, can deprive him of the power of proving his right and exercising his privilege, and against these it would be difficult, either by legal or constitutional provisions, entirely to guard."

I therefore, for all these reasons, dissent from the judgment just entered by the court

READ, J., dissenting.—A majority of the court think that a registry law, properly framed, is constitutional, and well calculated to prevent frauds at election. I agree with my brother Agnew, that the Registry Act is constitutional, and could be carried into effective operation.

I was counsel of Mr. Kneass in 1851, and of Mr. Mann in 1856, and from what I saw in those contested election cases, I was fully convinced that the election laws were utterly inefficient in preventing fraud, and subsequent experience has confirmed me in my opinion. In some districts of the city—"plague spots"—fraudulent voting is the rule, and honest voting the exception.

I am fully convinced that nothing but a registry law, honestly and firmly administered, can cure an evil which strikes at the root of our republican institutions.