# Commonwealth, Appellant, *v.* Moir.

*Constitutional law—Legislative control of municipalities*

Municipal corporations are agents of the state, invested with certain subordinate govermental functions for reasons of convenience and public policy. They are created, governed, and the extent of their powers determined by the legislature, and subject to change, repeal, or total abolition at its will. They have no vested rights in their offices, their charters, their corporate powers, or even their corporate existence.

The fact that the action of the state towards its municipal agents may be unwise, unjust, oppressive or violative of the natural or political rights of their citizens is not one which can be made the basis of action by the judiciary, nor are the motives of the legislators, real or supposed, in enacting legislation as to municipal corporations open to judicial inquiry or consideration.

*Constitutional law—Municipal corporations—Impossibility of execution of act—Act of March 7, 1901, known as the " Ripper Bill."*

The act of March 7, 1901, entitled " An act for the government of cities of the second class," although presenting serious difficulties in regard to the passage of ordinances, etc., by the lack of a complete system in the act itself and by the failure to repeal the requirements in that respect of the general act of May 23, 1874, is not for that reason unconstitutional, since the municipal government may be administered notwithstanding such defects.

*Constitutional law—Municipal corporations—Classification of cities.*

Classification of cities is a legislative and not a judicial question, and if it is based on difference of municipal affairs, and relatès to and deals with such affairs, the questions of where the line shall be drawn and what differences of system shall be prescribed for differences of situation are wholly legislative.

*Constitutional law—Municipal corporations—Temporary expedients in changing from one city government to another.*

The temporary expedients in the schedule of the Act of March 7, 1901, such as the appointment of a recorder in each of the existing cities of the second class and the continuance of the recorder in office until 1903, thus passing over an election, do not render the act unconstitutional.

A temporary and transitory provision that applies to all the present members of a class meets all the requirements of the temporary situation, and ends with the end of that situation, does not make the whole act local or special. That is the proper province of a schedule.

There is no constitutional right of election in reference to the office of mayor or chief executive of a city. The legislature might make the office permanently appointive, and what they can do permanently they may do temporarily.

Much legislative latitude must be allowed to temporary measures incident to the adjustment of changes of municipal system.

The act of March 7, 1901, is not unconstitutional because it vests in the governor the discretion of determining when it shall become operative by the appointment of recorders. This is a temporary expedient within the legislative control.

*Constitutional law—Removal of elected officer—Abolition of office.*

The office of mayor of a municipality is not a public office under the protection of the constitution, and the legislature has the power in imposing a new form of government on a city to abolish the office of mayor and to create a new chief executive office under the name of recorder.

As the legislature may abolish municipal offices by a change of the charter, the question how great or how small the changes by the new charter shall be, and to what particulars they shall apply, is one wholly for legislative consideration.

Under the act of March 7, 1901, the office of recorder is not identical either in substance or in name with the office of mayor. The recorder has far greater executive powers than his predecessor, the mayor, and yet lacks some of the other powers that the latter had.

The objection that the act of March 7, 1901 gives the governor the power to remove an elected officer without cause, is not well founded, inasmuch as section 1 of the act itself removes the mayor by abolishing the office, but section 2 of the schedule continues the mayor in office temporarily until his successor has been duly appointed under section 1. This is not a removal by the governor.

*Constitutional law—Public officers—Justice of the peace—Temporary expedient.*

The objection that the act of March 7, 1901, attempts to create an additional justice of the peace, permits his election at an improper time, and allows the governor to appoint to an office made elective by the constitution, is not a valid one. Clothing the chief executive of a city, virtute officii, with the powers and authority of a police magistrate or even of a justice of the peace technically so-called, is not necessarily void as providing for an additional justice of the peace, and if it should be so held on direct presentation of the question it would not invalidate the act of March 7, 1901, of which it is a subordinate and severable feature.

*Constitutional law—Appointment of public officers—Confirmation by senate—Constitution, article 4, section 8.*

Section 8, of article 4 of the constitution relating to the confirmation of appointments by the senate, has no application to municipal officers.

*Constitutional law—Title of act—Repeal.*

The repeal of previous acts on the same general subject is always germane to the title.

The act of March 7, 1901, is not open to the constitutional objection that it has more than one subject and one not expressed in the title. The repealing clause in the last section of the schedule is germane to the title.

*Constitutional law—Different laws for cities of the same class—Act of March 7, 1901, article 20.*

Even if article 20 of the act of March 7, 1901, should be construed to provide different laws for cities of the same class and, therefore, invalid, this will not affect the rest of the act. The article is an independent and easily severable provision.

There is no constitutional requirement of uniformity in legislation on municipal affairs. What is prohibited is local and special legislation on certain subjects and this means that the legislation must be general. The uniformity discussed in the decisions is only a test of generality.

*Constitutional law—Local and special legislation—Classification of cities.*

The act of March 7, 1901, is not such an abuse of the power of classification as to render it repugnant to section 7 of article 3 of the constitution relating to local and special legislation.

*Constitutional law—Local self-government—Bill of rights.*

The courts are not at liberty to declare an act void because in their opinion it is opposed to a spirit supposed to pervade the constitution, but not expressed in words. Where the fundamental law has not limited either in terms or by necessary implication, the general powers conferred upon the legislature, the court cannot declare a limitation under the notion of having discovered something in the spirit of the constitution which is not even mentioned in the instrument.

The act of March 7, 1901, does not violate those provisions in the constitution which preserve to the people local self-government.

McCollum, C. J., Dean and Mestrezat, JJ., dissent.

Argued April 23, 1901. Appeal, No. 124, Jan. T., 1901, by plaintiffs, from judgment of C. P. Lackawanna Co., March T., 1901, No. 710, for respondent on quo warranto, in case of Commonwealth ex rel. John P. Elkin, Attorney General, v. James Moir, Recorder of the city of Scranton. Before McCollum, C. J., Mitchell, Dean, Fell, Brown, Mestrezat and Potter, JJ. Affirmed.

Quo warranto to determine the right of respondent to the office of recorder of the city of Scranton. Before Archbald, P. J.

The respondent filed an answer, and the commonwealth demurred to it. The court entered judgment on the demurrer in favor of the respondent.

*Error assigned* was in entering judgment for respondent.

*I. H. Burns*, with him *Joseph O'Brien, M. J. Martin* and *Fred-*

*eric W. Fleitz*, for appellants.—The act in question is local, (*a*) because it only applies to three cities of the state; (*b*) because the principal matters legislated on are not proper subjects of classified legislation: Ayars's App., 122 Pa. 266; Kilgore v. Magee, 85 Pa. 401; Com. v. Patton, 88 Pa. 258; Scowden's Appeal, 96 Pa. 422; Wheeler v. Phila., 77 Pa. 338; McCarthy v. Com., 110 Pa. 246; Morrison v. Bachert, 112 Pa. 322.

Because it operates differently on different incumbents of the same office.

The act is void because it contains more than one subject not clearly expressed in the title: Com. v. Mercer, 9 Pa. C. C. Rep. 461; Ruth's App., 10 W. N. C. 498; Perkins v. Phila., 156 Pa. 554; Ridge Ave. Pass. Ry. Co. v. Phila., 124 Pa. 219; In re Road in Phœnixville Boro., 109 Pa. 44.

The act is void because it does not apply equally to all the cities of the second class.

No judgment can be entered for the respondent, for the reason that when he was appointed Scranton was not a city of the second class and the office of recorder did not exist: Com. v. McGroarty, 148 Pa. 606.

This act is against public policy, is unrepublican in form and substance, and is in violation of article 4, section 4, of the United States constitution, which guarantees to every state a republican form of government.

*John G. Johnson*, with him *Knox & Reed*, *Clarence Burleigh*, *Lyon & McKee*, *Lewis McMullin*, *George M. Hosack*, of *Murphy & Hosack*, and *William W. Smith*, intervening on behalf of William J. Diehl, mayor of Allegheny City.—The act is impossible of execution and therefore is void, inasmuch as no ordinances can be enacted, and no powers of the cities can be validly exercised thereunder.

The act is unconstitutional because it attempts a classification in the method of filling municipal offices and of exercising municipal powers, resting upon no proper discrimination or foundation: Com. v. Oellers, 140 Pa. 457; Allegheny City v. Millville, etc., St. Railway Co., 159 Pa. 411; Shaub v. Lancaster City, 156 Pa. 365; Kepner v. Com., 40 Pa. 129.

The act is unconstitutional because it is a local act, changing

the charters of cities, creating offices and prescribing the powers and duties of officers in cities: Perkins v. Philadelphia, 156 Pa. 554.

The act is unconstitutional because it vests in the governor the discretion of determining when it shall become operative: In re Census Supt., 15 R. I. 614; People v. Allen, 6 Wendell, 486; People v. Wheeler, 18 Hun (N. Y.), 540; People v. Board of Police, 46 Hun, 296.

The act is unconstitutional because it removes from their respective offices, during the terms for which they were elected, the mayors of the cities of the second class, and puts other persons therein: Respublica v. M'Clean, 4 Yeates, 399; Com. v. Gamble, 62 Pa. 343; Com. v. McCombs, 56 Pa. 436; Com. v. Weir, 165 Pa. 284; Com. v. Schneipp, 166 Pa. 401; People v. Albertson, 55 N. Y. 50; Hoke v. Henderson, 15 N. C. 1; Abbott v. Beddingfield, 125 N. C. 256; McCall v. Webb, 125 N. C. 243; White v. Hill, 125 N. C. 194; Dalby v. Hancock, 125 N. C. 325; Gattis v. Griffin, 125 N. C. 332; Wood v. Bellamy, 120 N. C. 212; Wilson v. Jordan, 124 N. C. 683; Silvey v. Boyle, 20 Utah, 205; Womsley v. Mayor, etc., of Jersey City, 61 N. J. 499; Houseman v. Com., 100 Pa. 231; State v. Wiltz, 11 La. Ann. 439; Com. v. Waller, 145 Pa. 235; Brower v. Kantner, 190 Pa. 182; Lloyd v. Smith, 176 Pa. 213.

The act is unconstitutional because of the lack of power in the legislature to do what is therein attempted, viz: in the same act to make the office of mayor both elective and appointive: Com. v. Callen, 101 Pa. 375.

The act is unconstitutional because, after making the office of recorder an elective one, it provides for a continuance in the office by appointment by the governor for such length of term as dispenses with an election at the time fixed by the constitution, viz: the next municipal election in February: In re Election of District Judges, 11 Colo. 373; Com. v. McCarthy, 3 W. N. C. 477; Brooke v. Com., 5 W. N. C. 416.

The act is unconstitutional because it gives to the governor a power to remove an elected officer without cause.

The act is unconstitutional because it violates those provisions of the new constitution which preserve to the people local self-government, and especially the right to choose their own local officers for the administration of local affairs: Page v.

Allen, 58 Pa. 338; Com. v. Zephon, 8 W. & S. 386; Sharpless v. Mayor of Phila., 21 Pa. 147; Law Assn. v. Topeka, 20 Wall. 655; Rathbone v. Wirth, 150 N. Y. 459; Attorney General v. Trombly, 89 Mich. 50; People v. Albertson, 55 N. Y. 50; State v. Mayor, etc., of Des Moines, 103 Iowa, 76; State ex rel. Holt v. Denny, 118 Ind. 449; State ex rel. Jameson v. Denny, 118 Ind. 382; City of Evansville v. State, 118 Ind. 426; State v. Moores, 55 Neb. 480; People v. Hurlbut, 24 Mich. 44; O'Connor v. City of Fond du Lac, 85 N. W. Repr. 327; People v. Lynch, 51 Cal. 15; State v. Hyde, 121 Ind. 20; Hanson v. Vernon, 27 Iowa, 28; Atty. Genl. v. Board of Councilmen of the City of Detroit, 58 Mich. 213; Maynard v. Board of Canvassers, 84 Mich. 228; Prouty v. Stover, 11 Kansas, 235; In re Assessments of Lands in the Town of Flatbush, 60 N. Y. 398.

The act is unconstitutional because it attempts to create an additional justice of peace; permits the election of such justice of peace at an improper time; and permits the appointment of such justice by the governor, although the constitution requires the office to be filled by election.

The recorder has not been legally appointed, even though the act be constitutional, because of the failure to obtain the consent of the senate.

*Richard C. Dale* and *James H. Torrey*, with them *A. A. Vosburg* and *H. A. Knapp*, for appellee.—The whole lawmaking power is committed to the legislature and its command must prevail unless clearly transgressing the constitutional prohibition. He who declares an act unconstitutional takes upon himself the burden of proving beyond all doubt that it is so. In determining the question we have nothing to do with the policy or principle of the statute, but merely is there or is there not a direct collision between its provisions and those of the federal or state constitutions: Lloyd v. Smith, 176 Pa. 213; Sugar Notch Borough, 192 Pa. 355; Powell v. Com., 114 Pa. 293; Com. ex rel. Wolfe v. Butler, 99 Pa. 540: Penna. R. R. Co. v. Riblet, 66 Pa. 164; Philadelphia v. Field, 58 Pa. 320; Erie, etc., R. R. Co. v. Casey, 26 Pa. 300; Butler's App., 73 Pa. 451.

A court cannot declare a statute unconstitutional and void solely on the ground of unjust and oppressive provisions, or because it is supposed to violate the natural, social, or political

rights of the citizen, unless it can be shown that such injustice is prohibited or such rights guaranteed or protected by the constitution: Cooley's Constitutional Limitations (5th ed.), p. 197; Sharpless v. Mayor of Phila., 21 Pa. 147; Com. v. M'Williams, 11 Pa. 61; Com. v. Reeder, 171 Pa. 505.

A municipal corporation is a creature of the state; it derives its powers from the state; the power that makes can unmake, change or modify. Nor does any municipal officer have any property right in his office, but the office may be abolished or changed by the legislature or new offices may be created: U. S. v. B. & O. R. R. Co., 17 Wall. 322; Burns v. Clarion County, 62 Pa. 425; Donohugh v. Roberts, 11 W. N. C. 186; Gas & Water Co. v. Downingtown Boro., 175 Pa. 341; Butler v. Penna., 10 How. 416; Crenshaw v. U. S., 134 U. S. 99; Thompson v. Com., 81 Pa. 314; Conner v. City of New York, 1 Selden, 285; Com. v. Plaisted, 148 Mass. 375; Meriwether v. Garrett, 102 U. S. 472; Baird v. Rice, 63 Pa. 489; Perkins v. Slack, 86 Pa. 283; Philadelphia v. Field, 58 Pa. 320.

There is no provision in the constitution securing to cities the right to elect their own chief executive, however he may be styled.

Even supposing that our constitution, by implication, secures to cities the right to select their own chief executive, yet the legislature in passing the act in question here has not infringed such principle.

Whether or not the legislature could permanently deprive a city of its supposed right to elect its chief executive officer as an incident of its right to confer and recall corporate power, the legislature may certainly make provisional or initiatory appointments to effect the change and put a new system of local government into operation: People v. Hurlbut, 24 Mich. 44.

It is not unconstitutional for the legislature to authorize the appointment of the chief executive officer of a city beyond a general or special election: Com. v. Clark, 7 W. & S. 127; Mayor, etc., of Baltimore v. State, 15 Md. 377; People v. Morgan, 90 Ill. 558.

So far from being exceptional it is the rule in putting in operation new systems of municipal government to legislate out of office a greater or less number of the old officers: Act

of June 1, 1885, P. L. 37, art. 15, sec. 1; Act of June 14, 1887, P. L. 395, sec. 3; Act of May 23, 1889, P. L. 277, art. 6, sec. 2.

The act of March 7, 1901, is not within the constitutional prohibition against local and special legislation: Ruan St., 132 Pa. 257; Hanover Borough's App., 150 Pa. 204; Lloyd v. Smith, 176 Pa. 213; Sugar Notch Borough, 192 Pa. 349; Com. v. Gilligan, 195 Pa. 504.

The act of March 7, 1901, is not unconstitutional by reason of the provisions in article 20: Com. v. Wyman, 137 Pa. 508; Com. v. Macferron, 152 Pa. 244.

The act in question does not conflict with article 3, section 3, of the constitution requiring bills to consist of a single subject clearly expressed in the title: In re Road in Phœnixville Borough, 109 Pa. 44; Com. v. Gilligan, 195 Pa. 504; Gas & Water Co. v. Downingtown Boro., 193 Pa. 255; Rodgers's Petition, 192 Pa. 97; Page v. Williamsport Suspender Co., 191 Pa. 511; Philadelphia v. Ridge Ave. Pass. Railway Co., 142 Pa. 491; Blood v. Mercelliott, 53 Pa. 391; Allegheny County Home's App., 77 Pa. 77; Fredericks v. Pennsylvania Canal Co., 109 Pa. 55; Myers v. Com., 110 Pa. 224; Clearfield County v. Cameron Twp. Poor District, 135 Pa. 86; Com. v. Morningstar, 144 Pa. 103; Donley v. City of Pittsburg, 147 Pa. 348; Kelley v. Mayberry Twp., 154 Pa. 440.

OPINION BY MR. JUSTICE MITCHELL, May 27, 1901 :

Municipal corporations are agents of the state, invested with certain subordinate governmental functions for reasons of convenience and public policy. They are created, governed, and the extent of their powers determined by the legislature, and subject to change, repeal, or total abolition at its will. They have no vested rights in their offices, their charters, their corporate powers, or even their corporate existence. This is the universal rule of constitutional law, and in no state has it been more clearly expressed and more uniformly applied than in Pennsylvania. In Philadelphia v. Fox, 64 Pa. 169, 180–81, this court, speaking through SHARSWOOD, J., said: "The city of Philadelphia is a municipal corporation, that is a public corporation created by the government for political purposes, and having subordinate and local powers of legislation. . . . It is merely an agency instituted by the sovereign for the purpose of carry-

ing out in detail the objects of government, essentially a revocable agency, having no vested right to any of its powers or franchises, the charter or act of erection (creation ?) being in no sense a contract with the state, and, therefore, fully subject to the control of the legislature who may enlarge or diminish its territorial extent or its functions, may change or modify its internal arrangements or destroy its very existence with the mere breath of arbitrary discretion. . . . The sovereign may continue its corporate existence and yet assume or resume the appointments of all its officers and agents into its own hands; for the power which can create and destroy can modify and change."

The fact that the action of the state towards its municipal agents may be unwise, unjust, oppressive, or violative of the natural or political rights of their citizens, is not one which can be made the basis of action by the judiciary. " The rule of law upon this subject appears to be that, except where the constitution has imposed limits upon the legislative power, it must be considered as practically absolute, whether it operate according to natural justice or not in any particular case. The courts are not the guardians of the rights of the people of the state, except as those rights are secured by some constitutional provision which comes within the judicial cognizance. The protection against unwise and oppressive legislation, within constitutional bounds, is by an appeal to the justice and patriotism of the representatives of the people. If this fail, the people in their sovereign capacity can correct the evil; but courts cannot assume their rights. The judiciary can only arrest the execution of a statute when it conflicts with the constitution. It cannot run a race of opinions upon points of right, reason, and expediency with the lawmaking power. . . . If the courts are not at liberty to declare statutes void because of their apparent injustice or impolicy, neither can they do so because they appear to the mind of the judges to violate fundamental principles of republican government, unless it should be found that these principles are placed beyond legislative encroachment by the constitution: " Cooley on Constitutional Limitations, ch. 7, sec. 4 (6 ed. 1890, p. 201).

" If the legislature should pass a law in plain, unequivocal and explicit terms within the general scope of their constitutional powers, I know of no authority in this government to

pronounce such an act void, merely because, in the opinion of the judicial tribunals, it was contrary to principles of natural justice, for this would be vesting in the court a latitudinarian authority, which might be abused, and would necessarily lead to collisions between the legislative and judicial departments, dangerous to the well being of society, or at least not in harmony with the structure of our ideas of natural government:" ROGERS, J., Commonwealth v. McCloskey, 2 Rawle, 374.

"It is no part of our business to discuss the wisdom of this legislation. However vicious in principle we might regard it, our plan duty is to enforce it provided it is not in conflict with the fundamental law:" Scowden's Appeal, 96 Pa. 422. This subject will be further discussed with reference to our own cases, in considering the argument that the statute violates the spirit of the constitution.

Nor are the motives of the legislators, real or supposed, in passing the act, open to judicial inquiry or consideration. The legislature is the lawmaking department of the government, and its acts in that capacity are entitled to respect and obedience until clearly shown to be in violation of the only superior power, the constitution. "It is urged that the act before us was not passed for this purpose" (as a police regulation) "but as its title expresses, 'to provide for cases where farmers may be harmed by such railroad companies' and it is contended that this shows conclusively that it was the design of the legislature to impose this new burden upon the railroad company for the benefit of the landholders and not for the security of the traveling public. . . . We cannot try the constitutionality of a legislative act by the motives and designs of the lawmakers, however plainly expressed. If the act itself is within the scope of their authority it must stand, and we are bound to make it stand if it will upon any intendment. It is its effect not its purpose which must determine its validity. Nothing but a clear violation of the constitution, a clear usurpation of power prohibited, will justify the judicial department in pronouncing an act of the legislative department unconstitutional and void:" SHARSWOOD, J., in Penna. R. R. Co. v. Riblet, 66 Pa. 164, cited with approval by the present chief justice in Com. v. Keary, 198 Pa. 500.

"The merits of the act of March 22, 1877, in relation to

cities of the second class . . . . are not a subject for our opinion. The only question before us in these cases is upon the power of the legislature to pass this law:" Kilgore v. Magee, 85 Pa. 401.

It ought not to be necessary to restate principles so fundamental, nor to cite authorities so familiar and so long established. But the range of the argument, and the energy with which it was pressed have seemed to make it proper to set forth clearly the only question before the court, the constitutionality of the statute in question. Much of the argument and nearly all of the specific objections advanced, are to the wisdom and propriety and the justice of the act, and the motives supposed to have inspired its passage. With these we have nothing to do, they are beyond our province and are considerations to be addressed solely to the legislature. This court is not authorized to sit as a council of revision to set aside or refuse assent to ill-considered, unwise or dangerous legislation. Our only duty and our only power is to scrutinize the act with reference to its constitutionality, to discover what if any provision of the constitution it violates. We proceed therefore to the consideration of the specific objections made.

First, it is said that the act is void because it is impossible of execution, and some very serious difficulties are pointed out in regard to the passage of ordinances, etc., by the lack of a complete system in the act itself, the failure to repeal the requirements in that respect of the general act of May 23, 1874, and yet the inconsistency of those requirements with such partial action as can be regularly taken under the provisions of this act. The imperfection of the act in this respect is manifest, but that does not make it unconstitutional. The effect may be to leave the affairs of the cities in a state of very regretable confusion, but it has not been shown that the municipal government cannot be administered notwithstanding. Every city in passing from one class to another, and a fortiori in passing from one charter to another in the same class retains and carries with it all its ordinances and makes no change in its government except such as the law renders necessary to adjust it to the class into which it goes : Com. ex rel. v. Wyman, 137 Pa. 508. It may require consideration by the courts to determine how much of the general system of municipal government under the

act of 1874 is compatible with the provisions of the present act, and how far the new system is self-sustaining, and not improbably legislative assistance will be required for a smooth and harmonious working under one or both. But these matters must be determined as they arise. For the present nothing has been shown against the practical operation of the act beyond great inconvenience.

Secondly, it is objected that the act attempts a classification in the method of filling municipal offices and of exercising municipal powers resting on no proper discrimination or foundation, in that it provides for methods of government and administration of cities of the second class different from those required in cities of the first and third class, in particulars where there is no real difference. It is sufficient to say of this that it is a legislative, not a judicial question. The very object of classification is to provide different systems of government for cities differently situated in regard to their municipal needs. It was recognized that cities varying greatly in population will probably vary so greatly in the amount, importance and complexity of their municipal business, as to require different officers and different systems of administration. Classification therefore is based on difference of municipal affairs, and so long as it relates to and deals with such affairs, the questions of where the lines shall be drawn, and what differences of system shall be prescribed for differences of situation, are wholly legislative. What is a distinction without a difference is largely matter of opinion. No argument, for example, could be more plausible than that there is no real difference in municipal needs, between a city of 99,000 and one of 100,000 population. It is a sufficient answer that the line must be drawn somewhere, and the legislature must determine where. So long as it is drawn with reference to municipal and not to irrelevant or wholly local matters, the courts have no authority to interfere.

Stress was laid, in the argument of this objection, on the provision making the chief executive in cities of the second class, called a recorder, appointive, while in cities of the first and third classes he is elected and called a mayor. It would not follow that the legislature had exceeded its powers, if this feature had been made one of the permanent provisions of the act, but we are not called upon to consider that question now,

for the appointment directed is only part of the temporary adjustments provided in the schedule for the change.

The substitution of a new system for one under which government has been previously carried on is always accompanied with some shifting of offices and duties, and some inconvenience. To reduce this to a minimum by temporary adjustment of the changes is the province of a schedule. In well considered legislation which involves such changes a schedule of temporary expedients is usually and properly added, and the expedients provided would need to be very clearly unconstitutional to justify a court in overturning them. In Lloyd v. Smith, 176 Pa. 213, it is said: " In an exchange of offices there may naturally be some overlapping of terms and duties, and if in the legislative view the need for a controller was immediate but the existing terms of the auditors prevented his present assumption of all the duties that would finally pertain to his office, it would not have been unwise, certainly not unconstitutional to meet the case by a temporary expedient." The provision in the schedule of the present act, that the governor shall within thirty days appoint a recorder in each of the existing cities of the second class, is a temporary expedient, to put the machinery of the new system of government in immediate operation. We could not say that it is an unreasonable expedient for that purpose, even if the question of its reasonableness was not one for the legislature alone.

In this connection two other objections based on the same provision may be conveniently considered, first that the act is local because the power of appointment of a recorder is confined to existing cities; and secondly, that the recorder appointed is to hold office until 1903, thus passing over an election and depriving the citizens of an opportunity to elect their executive. These provisions are not part of the substantial and permanent features of the act, but of the temporary adjustment of the change. The reference to " existing " cities was in view of the existing but temporary situation. There are no other cities about to enter the second class, and if by any unforeseen possibility there should be another before 1903, it is by no means clear that the proper construction of the word " existing " should not refer to that date. However that may be, a temporary and transitory provision that applies to all the present mem-

bers of the class, meets all the requirements of the temporary situation and ends with the end of that situation, does not make the whole act local or special. In this connection the language of this court in Pittsburg's Petition, 138 Pa. 401, 427 is very pertinent. It was urged that certain sections of the act then in question made the act local " by fixing dates at which acts necessary to put the government in operation are to be done, which were possible only to one city, the city of Pittsburg, and which are impossible to the city of Allegheny which has come into the class since the act was passed. The reply to this objection is, that, at the date when the act became a law, there was but one city in the second class. The provisions of the act were general in their character. They related to all cities of the second class. If there had been several such cities, the terms employed would have applied to all alike. It was necessary, in order to give effect to the change in the system of municipal government, that a definite time should be fixed upon at which the change should take place and the new system be put in operation. The trouble with the act is not that it made such a provision for cities then entitled to a place in the second class, but that it did not also make similar provisions for cities that should thereafter be entitled to come into the class. We cannot hold, however, that the failure to provide a date for the organization of cities afterwards to come into the class, deprives such cities of the benefit of the law, or renders it local, and so, inoperative, in the cities to which it would otherwise be applicable."

Of the objection that the citizens are deprived of an opportunity of electing the chief executive, it is sufficient to say that there is no constitutional right of election in reference to that office. The legislature might make it permanently appointive, and what they could do permanently they may do temporarily: Philadelphia v. Fox, 64 Pa. 169. It is conceded that if the act bore date of approval so near the day of election that the electors would have no proper opportunity to prepare for the election, the postponement would be free from objection. But what is a reasonable or proper opportunity is a question for the legislature. That the prolongation of a temporary appointment to a vacancy beyond an election not unduly close at hand, is unusual and contrary to what citizens are accustomed to regard

as their moral and political rights, may be conceded, but that does not make it unconstitutional. Being an exercise of a legal and constitutional right by the legislature, they are answerable for their action only to their constituents.

The objections we have been considering, and in fact nearly all that have been raised in the case, are based on the provisions of the schedule, rather than on the permanent provisions of the act. Much legislative latitude must be allowed to temporary measures incident to the adjustment of changes of municipal system, and this consideration deprives the objections of some of the weight they might otherwise have.

It is further said that the act is unconstitutional because it vests in the governor the discretion of determining when it shall become operative by the appointment of recorders. This again is an objection founded on the temporary expedients of the schedule, and would be sufficiently answered by the considerations already discussed under that head. That statutes making important changes in the law should provide definitely when they shall go into effect is desirable but not essential. The legislature may make them operative from a future date, or within certain limitations make them retroactive. The present act in its first section abolishes the office of mayor and substitutes that of recorder. This without more would operate, as the rest of the act does, from the date of its approval. But to prevent a gap in the government and the resulting confusion of the city business, the schedule in section 2 continues the office of mayor temporarily until the new office of recorder is filled by the governor's appointment under section 1. There is nothing in this that is not entirely within the reasonable province of a schedule for the initial operation of necessary changes.

A further objection made is that the act removes an elected officer, the mayor, from office during the term for which he was elected, by a mere change in the name of the office. The right to grant a new charter to the city, imposing a new form of government, is conceded, even though the effect is to abolish the office and to deprive the officer of his place. But it is argued that the merely nominal abolishing of the office by the substitution of one with the same powers and duties only under a different name is beyond the legislative power. It does not appear how this conclusion follows. There is no right to

a public office unless it is under the express protection of the constitution (Lloyd v. Smith, 176 Pa. 213), and such protection is nowhere given to municipal officers. On the contrary the universal rule is that, unless otherwise directed by the new act, the officers go out with the charter under which they held, and the officers under the new charter take their places whether under the same or a different name. Merely official positions, unprotected by any special constitutional provisions are subject to the exercise of the power of revision and repeal by the legislature: Kilgore v. Magee, 85 Pa. 401. " The argument is that the act is unconstitutional because it transfers the duties and emoluments of the office of district attorney to another. . . . The office of district attorney is not one of those which are usually denominated constitutional. . . . Not having been mentioned by the constitution the legislature was left with unrestricted power to prescribe what the duties of the office should be, what the length of its tenure, what its emoluments and how it should be filled. Having the power to create, they have also the power to regulate and even destroy. Undoubtedly the legislature may at any moment repeal the act of 1850 and abolish the office. They may provide a substitute for it:" STRONG, J., Com. v. McCombs, 56 Pa. 436. " As this decision will deprive the respondent of a portion of the term of his office, some question arises as to the power of the legislature to enact a law having such an effect. But this is fully met by the decision of this court in the case of Commonwealth v. Mc-Comb, 56 Pa. 436. We there held as to offices which are legislative only and not constitutional, the power which created them may abolish or change them at pleasure without impinging upon any constitutional right of the possessor of the office, and without violating any duty of the legislative body:" Com. ex rel. v. Weir, 165 Pa. 284.

It being conceded that the legislature may abolish municipal offices by a change of the charter, the question how great or how small the changes by the new charter shall be, and to what particulars they shall apply, is one wholly for legislative consideration. In the act under discussion the changes in the general scheme of government are many and important. With respect to the offices of mayor and recorder, each being the chief executive of a city, a similarity in their powers and duties

is natural if not essential, but the offices are not identical either in substance or in name. The recorder has far greater executive powers than his predecessor the mayor, and yet lacks some of the other powers that the latter had. The very argument of the appellants first noticed, on the impossibility of execution of the act, was based on the recorder's want of the authority in the passage of ordinances which the mayor had, and which it was contended was essential to the operation of the new system.

A closely analogous objection is that the act gives the governor the power to remove an elected officer without cause. But this is not a correct reading of the act. Section 1 of the act itself removes the mayor by abolishing the office, but section 2 of the schedule continues the mayor in office pro tempore until his successor has been duly appointed under section 1. This is not a removal by the governor whether that would be valid or not; but a legislative adjustment of the conditions of the change made necessary by the new charter. This has already been sufficiently discussed in considering the necessity and province of the schedule.

The objection that the act attempts to create an additional justice of the peace, permits his election at an improper time and allows the governor to appoint to an office made elective by the constitution need not be discussed at any length at this time. Clothing the chief executive of a city, virtute officii, with the powers and authority of a police magistrate, or even of a justice of the peace, technically so-called, is not necessarily void as providing for an additional justice of the peace, and if it should be so held on direct presentation of the question it would not invalidate the present act of which it is a subordinate and severable feature. The provision for appointment by the governor is part of the schedule which has already been sufficiently discussed.

The objection that even if the appointment of a recorder were valid at all, the appointment of the respondent is void for want of confirmation by the senate is based on section 8 of article IV of the constitution, and it is sufficient to say that that section has no application to municipal officers: Com. v. Callen, 101 Pa. 375.

It is further said that the act has more than one subject and

one not expressed in the title.    This is based on the last section
of the schedule, which is a repealing clause.    It is enough to
say at present that the repeal of previous acts on the same
general subject is always germane to the title.    Usually the
repealing clause is only declaratory of what would be the legal
effect without it, but it is useful as preventing doubt upon the
legislative intent.    And a clause saving from repeal an act
that is not within the intent but might have appeared to come
within the language of the repealing clause merely operates as
a proviso, and is in no sense a re-enactment or extension of the
act so executed.    It makes no new law.    If the section in
question repeals expressly any act not germane to the general
subject in the title, which has not yet been shown, the repeal
might be ineffective but would not vitiate the whole act.

Again it is said that the act is unconstitutional because it
provides by article 20, different laws for cities of the same class.
The article reads : " From and after the passage of this act, all
laws relating to cities of the third class shall continue to apply
to cities of that class which have passed or may pass into a city
of the second class by reason of increase in population, except
so far as such laws are supplied by, or in conflict with, laws
relating to cities of the second class."    It would be sufficient
to say that even if this article cannot stand, it will not affect
the rest of the act.    It is an independent and easily severable
provision.    But the article is at least partly declaratory and it
does not at present appear that it is anything more.    Local and
special laws are not repealed by subsequent general ones, unless
such is the legislative intent, either expressed or unavoidably
implied by the irreconcilability of the continued operation of
both.    How far this principle may be applicable to a city pass-
ing from one class to another is yet an open question.    Thus
for example when the city of Allegheny passed from the third
to the second class it carried with it certainly all its local and
special laws, enacted prior to 1874, which it had retained in
the third class and which were not in irreconcilable conflict
with the laws governing the second class.    Whether it carried
also the powers and privileges which it had acquired as a city
of the third class, subject of course to the same limitation that
they are not in conflict with the system prescribed for the
second class, has not yet been expressly considered.    There is

strong reason why that should be the rule. The sweeping away in one breath of a whole system, the growth of years and experience, and the substitution of an entirely new one, is fraught with great inconvenience if not with more serious consequences. This court has said in Com. v. Wyman, 137 Pa. 508, and Com. v. Macferron, 152 Pa. 244, that the changes in the transition are to be confined to those absolutely necessary for adjustment to the new class. Some of the language used in Com. v. Macferron would appear to indicate a presumption that each class is so distinct that in leaving it a city leaves everything that it acquired while in it. But the principle of minimizing the changes was again stated by our Brother FELL in Shroder v. Lancaster, 170 Pa. 136, without any such qualification. It is to be remembered that there is no constitutional requirement of uniformity. The mandate of the constitution is negative, that laws on certain subjects shall not be local or special. That means that they must be general, and the uniformity which is discussed in the decisions is not a necessary requirement, but only a test of the generality which is what the constitution commands. Article 20 of the present act settled the legislative intent in favor of the view that cities passing from the third to the second class shall carry with them all the laws not in conflict with the system provided for the second class. Whether such intent violates the required generality of the act may become the subject of consideration hereafter. But even if the article must fall on this account, it will not carry down the rest of the act, and that is all we need decide now.

It is further argued that this act is local and special and therefore contrary to section 7 of article 3 of the constitution, because although it relates in terms to cities of the second class, it is intended to apply only to the three existing cities of Pittsburg, Allegheny and Scranton. This objection is based mainly on the schedule and has been sufficiently discussed already, except with reference to the intimation in the dissenting opinion, that it is an abuse of the power of classification, and perhaps that the principle of classification itself may be a departure from correct constitutional construction. It is far too late to discuss this question. Classification was sanctioned deliberately and unanimously by our predecessors, more than a quarter of a cen-

tury ago and has never been shaken since. No judge now on this bench had any part in the original decision (Wheeler v. Philadelphia, 77 Pa. 338), and to start a question of its correctness would be a most flagrant and unjustifiable violation of the salutary maxim stare decisis. Nor is there any disposition to do so. On the contrary every year's experience and every new question presented, have vindicated the wisdom and correctness of the principle there enunciated, and the steady tendency has been to broaden instead of narrowing its applicability. As has been said by this court, the constitution of 1874 was a new departure in the history of American law. Instead of being confined as all previous constitutions had been, to the framework of the government, and to general principles for the protection of individuals and minorities against the oppression of irresponsible majorities, the people voluntarily tied their own hands, in the persons of their legislative agents by a binding code of particulars and details that stand in the path of much just, desirable and necessary legislation. The most emphatic expression of this limitation upon the powers of the legislature is found in article 3, section 7, under which most of the cases have arisen. The real evils, however, at which that article was directed, are pointed out in Com. v. Gilligan, 195 Pa. 504, and Clark's Estate, 195 Pa. 520, and every decision in the last decade has shown the steady trend of the court, under the guidance of wider experience, not to extend that article to cases not really within the evil prohibited, though the form may have the appearance of coming within the words of the prohibition. As an illustration of the effect of a contrary view we may look at the case of the city of Philadelphia. The present charter, the act of 1885 commonly known as the Bullitt Bill, was undoubtedly framed and passed in the most honest and patriotic effort for reform in municipal administration, whatever its success may have been in that direction. But its intent was just as distinctly local as that of the act of 1901 is alleged to be, and the construction that would strike down the latter would as inevitably strike down the former, and send Philadelphia back irremediably to its former discredited system. The sound result, after all views have been considered, is that the control of the general subject of municipal administration is a necessary governmental power that has been left by the constitution where

it has always been, in the legislature, and that for any misuse of it the remedy must be applied by the constituencies in their dealing with their representatives.

The public interest of the questions involved, though not always their difficulty, has led us to discuss thus in detail the specific objections to the act that the learning and ingenuity of eminent counsel have been able to suggest. There remains one which is based upon broader and more far-reaching considerations than the others, though like most of them it is directed against the schedule. Indeed, the objections to this act may be summed up in the classic phrase in cauda venenum est. It is urged that it violates the spirit of the constitution in those provisions and that general intent which preserves to the people the right of local self-government.

The objection is serious, and there can be no denial that some of the provisions of the schedule infringe upon what the citizens generally are accustomed to regard as their political rights. But our view must be confined closely and exclusively to the constitution.

It may be admitted that even an act of the legislature can so far violate the spirit of the constitution as to be void, though not transgressing the letter of any specific provision. But such violation is exceptional and must be made to appear beyond all doubt. Such, for example, is the illustration given by Chief Justice THOMPSON in Page v. Allen, 58 Pa. 338, 346: " To illustrate this idea, the executive power of the state under the constitution is lodged in a governor. It would be manifestly repugnant to these provisions of the constitution if an act of assembly should provide for the election of two executives at the same election, yet it would be unconstitutional only by implication, there being no express prohibition on the subject." Prima facie, the legislative authority is absolute except where expressly limited. This is the uniform principle of all political and legal views, and of all constructions recognized by constitutional law.

" To me it is as plain that the general assembly may exercise all powers which are properly legislative and which are not taken away by our own or by the federal constitution, as it is that the people have all the rights which are expressly reserved. We are urged, however, to go further than this, and

to hold that a law, though not prohibited, is void if it violates the spirit of our institutions or impairs any of those rights which it is the object of a free government to protect, and to declare it unconstitutional if it be wrong and unjust. But we cannot do this. It would be assuming a right to change the constitution, to supply what we might conceive to be its defects, to fill up every casus omissus, to interpolate into it whatever, in our opinion, ought to have been put there by its framers:" BLACK, C. J., Sharpless v. Mayor of Phila., 21 Pa. 147, 161.

" However easy it may be to demonstrate that public debts (subscriptions to railroad and other enterprises) ought not to be created for the benefit of private corporations, and that such a system of making improvements is impolitic, dangerous, and contrary to the principles of a sound public morality, we can find nothing in the constitution on which we can rest our consciences in saying that it is forbidden by that instrument:" BLACK, C. J., Moers v. City of Reading, 21 Pa. 188, 200.

" To justify a court in pronouncing an act of the legislature unconstitutional and void, either in whole or in part, it must be able to vouch some exception or prohibition clearly expressed or necessarily implied. To doubt is to be resolved in favor of the constitutionality of the act:" SHARSWOOD, C. J., in Com. ex rel. v. Butler, 99 Pa. 535.

" In creating a legislative department, and conferring upon it the legislative power, the people must be understood to have conferred the full and complete authority as it rests in and may be exercised by the sovereign power of any state, subject only to such restrictions as they have seen fit to impose and to the limitations which are contained in the constitution of the United States. The legislative department is not made a special agency for the exercise of specially defined legislative powers, but is entrusted with the general authority to make laws at discretion:" STERRETT, J., in Powell v. Com., 114 Pa. 265, 293.

" Whatever the people have not, by their constitution, restrained themselves from doing, they, through their representatives in the legislature may do. This latter body represents their will just as completely as a constitutional convention in all matters left open by the written constitution. Certain

grants of power, very specifically set forth, were made by the States to the United States, and these cannot be revoked or disregarded by state legislatures. Then come the specific restraints imposed by our own constitution upon our own legislature. These must be respected. But, in that wide domain not included in either of these boundaries, the right of the people, through the legislature, to enact such laws as they choose, is absolute. Of the use the people may make of this unrestrained power, it is not the business of the court to inquire:" DEAN, J., Com. ex rel. v. Reeder, 171 Pa. 505, 513.

"Nor are the courts at liberty to declare an act void because, in their opinion, it is opposed to a spirit supposed to pervade the constitution, but not expressed in words. Where the fundamental law has not limited, either in terms or by necessary implication, the general powers conferred upon the legislature, we cannot declare a limitation under the notion of having discovered something in the spirit of the constitution which is not even mentioned in the instrument:" Cooley, Constitutional Limitations, ch. VII, sec. VI.

"It is also a maxim of republican government that local concerns shall be managed in the local districts, which shall choose their own administrative and police officers, and establish for themselves police regulations, but this maxim is subject to such exceptions as the legislative power of the state shall see fit to make, and when made, it must be presumed that the public interest, convenience and protection are subserved thereby. The state may interfere to establish new regulations against the will of the local constituency, and if it shall think proper in any case to assume to itself those powers of local police which should be executed by the people immediately concerned, we must suppose it has been done because the local administration has proved imperfect and inefficient, and a regard to the general well-being has demanded a change:" Cooley, Constitutional Limitations, ch. VII, sec. V.

These citations might easily be multiplied, but I have not thought it necessary to lengthen this opinion by going outside of the text books of recognized authority, and our own decisions. These establish beyond question the general rules of constitutional law, and show that nowhere have they been more uniformly and strongly enforced than in Pennsylvania. Some

of the cases arose before the adoption of the present constitution, but this does not affect the principles of the decisions even though some of the actual questions might now be decided differently under the provisions of the present constitution, for when the constitution has once expressly spoken, all further debate is at an end. The present constitution, as has been said more than once by this court, displays a strong intent to limit the power of the legislature with reference to interference in local affairs. As said by our Brother DEAN in Perkins v. Philadelphia, 156 Pa. 554 (565) : " Assuming what was the settled law, that the general assembly had all legislative power not expressly withheld from it in the organic law, they (the convention) set about embodying in that law prohibitions which should in the future effectually prevent the evils the people complained of. Article 3 is almost wholly prohibitory ; it enjoins very few duties, but the ' thou shalt nots' number more than sixty." This incontrovertible evidence that the constitution is the result of a full, detailed, exhaustive consideration of the subject of legislative control over merely local affairs, is of itself a conclusive argument against any further additions by the courts to its sixty and more expressed prohibitions. There is no sounder or better settled maxim in the law than expressio unius exclusio est alterius, and when the authorities which have the right to control any subject, be they only parties to a private contract, or the sovereign people in the adoption of their constitution, have fully considered and determined what shall be the rights, the powers, the duties or the limitations under the instrument, there is no longer any room for courts to introduce either new powers or new limitations. To do so would, in the language of Chief Justice BLACK already quoted, " be assuming a right to change the constitution, to supply what we might conceive to be its defects, to fill up every casus omissus, to interpolate into it whatever in our opinion ought to have been put there by its framers."

The most earnest consideration of the objections to the act of 1901 has convinced us that they are not such as authorize the courts to declare the act void for conflict with the constitution, but must be addressed only to the legislators and their constituencies.

Judgment affirmed.

MR. JUSTICE DEAN, dissenting:

If this act were not clearly in conflict with the fundamental law, or if the consequences to which the judgment may lead, were not deplorable, or, if it affected only the immediate parties to it, and would not serve as a precedent for future cases, I would not feel myself called upon to dissent of record. But all these reasons exist, and it is not without regret that I feel constrained to express a decided dissent from the judgment.

To my mind this act is palpably unconstitutional because it violates section 7, article 3 of that instrument, which section is as follows:

" The general assembly shall not pass any local or special law regulating the affairs of counties, cities, townships, wards, boroughs or school districts; . . . . incorporating cities, towns, or villages, or changing their charters, . . . . creating offices or prescribing the powers and duties of officers in counties, cities, boroughs, townships, election or school districts."

The act before us affects but three cities in the commonwealth, Pittsburg, Allegheny and Scranton. It does not touch Philadelphia city, nor any one of the many other cities of the state; nor is there a single provision in it for any city which may hereafter reach the population of these three cities. It applies specially to these three; changes their charters; puts them under special provisions different from all other cities; to all intents and purposes for a long period governs them by a high executive officer of the commonwealth, resident at Harrisburg, many miles distant, necessarily ousting local officers elected by the people, whose terms have not yet expired. There is nothing peculiar in the geographical location of these cities, or in the character of their population, or business interests, which calls for peculiar legislation such as this; nor is it intimated in the bill, that any reason existed for depriving them of self-government and subjecting them to a foreign one, that would not apply to every other city in the state. It is given as the controlling reason in the majority opinion for declaring the act constitutional, that nowhere does that instrument expressly forbid such legislation, and therefore, not being expressly forbidden, the legislature has all power not withheld. This proposition has been stated more than once in like language by courts when discussing constitutional questions; and while

the facts in the cases before them did not render the language inapplicable, it was never intended to be of universal or even of common application. It is conceded by all that the main reason for calling the constitutional convention of 1873 was to devise some means by which the annual flood of local legislation should be stopped; local laws were being passed every year for every imaginable selfish and sordid purpose without the least regard for the public good; the legislature was demoralized; the people were becoming debauched.

That convention, after most careful deliberation, adopted article 3, in which occurs section 7, heretofore quoted. If enforced, it created an effectual barrier against the evil. Many attempts were made to evade it in the legislature immediately following its adoption, and many acts were either vetoed by the governor, or declared invalid by the courts because of its violation.

But there came before this court the act of May 23, 1874, (see Wheeler v. Philadelphia, 77 Pa. 338), which divided the cities of the state into three classes for the purpose of corporate legislation, and which authorized the legislature, by general laws applicable to each class, to legislate only for the cities of that class. I always doubted the authority of this court to uphold this act; the reasoning in vindication of the judgment is not satisfactory or convincing; it is based upon the necessity for classification because of the inconvenience that would result if classification of cities was not held constitutional. It seems to me to be judicial legislation of the gravest character; it wrote into the constitution what was not there, and was not intended by the framers of it to be there. While I admit the inconvenience of enforcing strictly article 3 in all its provisions, it was but a temporary inconvenience, which could have been and should have been remedied by an amendment to the constitution, according to the method pointed out in it, and not, practically, by an amendment adopted by this court. The court gave way, and more than once since it has been placed in the same dilemma as it was on the question of retroactive legislation, discussed by Chief Justice GIBSON in Greenough v. Greenough, 11 Pa. 489, where he says:

" But retroactive legislation began and has continued because the judiciary has thought itself too weak to withstand.

. . . . Yet had it taken its stand on the ramparts of the constitution at the outset, there is some little reason to think it might have held its ground. Instead of that, it pursued a temporizing course till the mischief had become intolerable, until it was compelled to reverse certain acts of legislation."

The court, out of a tender regard for the doings of a co-ordinate branch of the government had yielded time after time to encroachments upon the judiciary department, until in Norman v. Heist, 5 W. & S. 171, and in Greenough v. Greenough, supra, it was confronted by acts which, in effect, took from one man his land and gave it to another. This was a little too much for the court to stand. So it stopped just there, with the keen regret expressed by Chief Justice Gibson that it had not stopped sooner. In a very short time the whole series of retroactive laws were, in effect, swept from the statute book by the very court which had at first upheld them. By our decision in the case before us, we are going a step beyond anything heretofore allowed in the line of special legislation. It is purely a question of law whether section 7 of article 3 of the constitution has been violated, yet, we in effect say, it is the province of the legislature to decide the question and that we will not inquire into it. This, on our part, is a grave mistake. I would not encroach one inch on the authority of the legislature, but I would not allow that body, nor the executive, to encroach one inch on ours. We have now before us an act which, it is true, does not take one man's land and give it to another, but it does take from one set of men the offices given them by the people, hands them over to the governor, that he may confer them on others. Here we should call a halt upon such unconstitutional usurpation of power. What the next step in this direction will be we can only conjecture; factional politics and partisan politics are not troubled by scruples; under the principle of this decision there is nothing to hinder a hostile partisan majority in the legislature from ousting the party in power in Philadelphia, a city of the first class, and placing its government in possession of the minority. The time is not very remote in the past, in English politics, when the victorious political party, as soon as it was seated in power, promptly proceeded to cut off the physical heads of their leading antagonists and confiscate their property; it is not very remote in the future

when the victorious political party will promptly proceed to cut off the political heads of its opponents where they hold office by the municipal votes of cities.

But to continue the judicial history of section 7, of article 3: Wheeler v. Philadelphia allowed classification; the law opened the gate, and we were time and again confronted by acts which, under the guise of general legislation, sought to evade the inhibitions of article 3.

In Ayars's Appeal, 122 Pa. 266, we were forced to say: "Subsequent legislation (that is, subsequent to Wheeler v. Philadelphia) clearly indicates that the scope of the decision in Wheeler v. Philadelphia was either misunderstood or ignored. It was never intended to license indiscriminate classification as a mere pretext for the enactment of laws essentially local or special."

We held in Scowden's Appeal, 96 Pa. 422, that classification not grounded on an imperious necessity, was special legislation, and would be stricken down. Hence, when the legislature undertook to increase the classes to five, afterwards to seven, we declared the acts unconstitutional, because such increase was without the slightest foundation in necessity. This court, after having decided that necessity warranted three classes, soon found itself forced to decide that it warranted no more. It was thus in the inconsistent position of acknowledging the authority of the legislature to determine the necessity of three classes, but denying its authority to say that more than three were necessary. This was plainly passing on the merits of the acts, when it was attempted to increase the classes. And I do not disclaim the power or wisdom of the court in so doing after it had acknowledged the authority of the legislature to classify at all, in the total absence of such authority in the constitution. It was bound to prevent the abuse of its own decision.

What I object to here is, that the majority of the court disclaim the right to inquire into the purposes of this act, because it is sanctioned by the ostensible legality of general legislation for a class. More than thirty cases followed Wheeler v. Philadelphia, wherein the distinction between local and general legislation was involved. Not only was the question of the necessity for classification discussed, and the judgments determined by inquiry into the merits of the acts, but in Scranton School

District's Appeal, 113 Pa. 176, in Philadelphia v. Haddington
M. E. Church, 115 Pa. 291, and in Weinman v. Wilkinsburg,
etc., Pass. Railway Company, 118 Pa. 192, the merits of the
pretended general legislation for a class were inquired into and
the acts pronounced unconstitutional.   In the first named case
we said:

" All our recent decisions are to the effect that if local results
either are or may be produced by a piece of legislation, it
offends against the article prohibiting local and special legis-
lation." .

It is too late, after these decisions, to disclaim our judicial
power to inquire, whether the act before us is an adroit attempt
to evade the constitutional prohibition against local and special
legislation.   From its very terms it touches no subject which
is not common to every other city in the commonwealth, and if
there be a necessity for such legislation in these three cities,
then there is the same necessity in all the others.   This fact of
itself stamps it as local and special legislation, for as is said
in Ayars's Appeal, supra, there must be a necessity for the legis-
lation " springing from manifest peculiarities, clearly distin-
guishing those of one class from each of the others."   No
peculiarities in cities of the second class demanding such a
law are even pretended.   Every member of this court concedes
that this legislation is vicious.   Why?   They do not answer;
but, to my mind, it is apparent that its vice consists in its fla-
grant violation of the fundamental law.   We know its purpose
was to oust one set of municipal officers in three certain cities,
put in place, either directly or indirectly, by the people, and
give their offices to others, through the chief executive of the
state.   This is the inevitable result from the bill itself.   Can
we assume that our lawmakers do not intend the obvious re-
sults of their acts ?

It will be noticed that I have given no attention to the many
objections of appellants to the details of the bill; it is argued
that each one of them is fatal; this may be correct; I will not
pass upon them without a thorough examination.   I place my
dissent upon the broad ground that it is local and special legis-
lation under the guise of a general law, therefore, is in direct
violation of section 7, article 3, of the constitution.   The ma-
jority opinion is, in the main, based on the authority of the

legislature to pass a general law for a class and a disclaimer of our authority to inquire into the merits, to ascertain whether the law was intended to be, and is in fact, a local and special law in its results. I concede, there is no express prohibition in the constitution forbidding such legislation if it be in general terms a general law, but, if it be only in terms general, nevertheless, in intent and results, special, then its unconstitutionality is a necessary implication, and we are not shut off in our inquiry by general terms. The argument to sustain the act because of no express prohibition in the constitution must fail in face of the plainly implied one.

In Commonwealth v. Zephon, 8 W. & S. 386, it is held: " A constitution is not to receive a technical construction like a common-law instrument or statute. It is to be interpreted so as to carry out the great principles of the government, not to defeat them."

In Page v. Allen, 58 Pa. 338, Justice THOMPSON, in expressing the opinion of the court, says: " It is usual on the part of those who insist on the constitutionality of any given statute, to claim that it must be regarded as constitutional, unless expressly prohibited by some provision in the constitution. In other words, in construing the constitution of the state, whatever is not expressly denied to the legislative power is possessed by it. The opposite of this rule, I may remark, is the construction of the federal constitution. I assent to this, but not that the inhibitions of the constitution must be always express. They are equally effective, and not less to be regarded, when they arise by implication, and this is the case when the legislative provision is repugnant to some provision of the constitution." There are many other authorities to the same effect.

I fear the time is not far distant when the pernicious results of our decision will either bring about a constitutional enactment to remedy the mischief, or move us to overrule it.

We concur in the foregoing dissent.

McCOLLUM, C. J., and MESTREZAT, J.