## New Jersey Interurban Coach Co. et al. v. City of Easton et al.

*Aaron Goldsmith,* for plaintiffs;  *Herbert F. Laub,* for defendants.

STEWART, P. J., March 12, 1928.—The plaintiffs filed a bill in equity and we granted a preliminary injunction. Upon the day fixed for a hearing the defendants came into court and agreed upon the record that the case should be disposed of as upon final hearing, without the filing of an answer and without the taking of testimony. The case was thoroughly argued by the learned counsel representing the parties, and while the briefs filed are very elaborate, in our judgment, the case is in a very narrow compass. The bill set forth in effect that an ordinance was adopted by the City of Easton on July 18, 1919. The title of the ordinance is "An ordinance regulating traffic upon the streets and highways of the City of Easton, and declaring certain acts pertaining thereto nuisances, and prescribing the penalties therefor." The 19th section, so far as it applies to this case, is as follows: "The Department of Public Affairs is hereby authorized to make any such additional rules or regulations as emergencies or extraordinary conditions may require or warrant." The bill also sets forth that, in accordance with the provisions of above ordinance and under the authority just quoted, the Department of Public Affairs promulgated certain rules which are to be effective on or after March 1, 1928. Then follow certain routes over certain streets of the city applicable to the Philadelphia Rapid Transit Line, the Waer Bus Company, Inc., the Easton and Martin's Creek Bus Line and the New Jersey Interurban Bus Company,

Inter-County Motor Company. These traffic rules or regulations, assigning special streets to the plaintiffs, were especially objected to and constitute the main ground of complaint. Then there are certain other provisions as follows:

"1. There will be no other interurban bus stops in the city limits." That provision plaintiffs object to.

"2. All busses at terminal stops must park with both wheels parallel to the curb, and as close to it as the conformation admits." That provision plaintiffs do not object to.

"3. No interurban busses permitted more than fifteen minutes at terminal stops for loading and unloading." That provision plaintiffs object to, but they protest that they have never violated it.

"4. Unless busses at terminal stops immediately unload, load and proceed, motors must be shut off—except in cold weather, when it is necessary to keep motor warmed by running of engine." That provision plaintiffs do not object to.

"5. When extra busses are necessary, or special busses are used to and from terminal stops, they shall not be brought to terminal stops more than fifteen minutes before starting time. Busses arriving at long periods before starting time must be kept at some remote parking place for the time of dead service, unless special arrangement is otherwise made." That provision plaintiffs object to, but they protest that they have never violated it.

"6. Special chartered busses of lines in interurban service, other than those assigned to terminal stops, will load and unload on North Second Street in front of school grounds, unless special arrangements are previously made for hotel or other loading and unloading." That provision plaintiffs do not object to.

The above traffic rules or regulations were signed by "S. S. Horn, Mayor, Superintendent Department of Public Affairs."

It is scarcely necessary to discuss the right of a city of the third class to accomplish the same thing that was intended to be accomplished by the traffic rules or regulations prior to Jan. 1, 1928, provided it adopted an ordinance confining companies like the plaintiffs to certain streets. In Setzer v. City of Pottsville, 73 Pa. Superior Ct. 573, the syllabus is: "The Act of July 26, 1913, P. L. 1374 (Public Service Company Law), and the Act of June 1, 1915, P. L. 685, giving to cities the power to regulate and license certain motor-vehicles, are not repugnant or inconsistent. The provisions of the two acts, so far as they relate to the same subject, are not irreconcilable, and there is no express repeal in the latter act. An ordinance passed under the provisions of the Act of June 1, 1915, P. L. 685, designating certain streets on which interurban busses should be operated, and forbidding such operation upon other streets of the city, is not an unreasonable exercise of the power conferred in that act, nor does it conflict with the provisions of the Public Service Company Law." To the same effect, see Collins et al. v. Public Service Commission, 84 Pa. Superior Ct. 58, bottom of page 62. Of course, the decisions in those cases did not pass upon the right of a city to delegate its functions to a superintendent of a department of public affairs. To apply the principle to the present case, it would have to be held that if the city acted in a proper way, it had the right to confine motor-busses to the use of certain streets in the city. However, the situation is completely changed by the passage of "The Vehicle Code," which was approved May 11, 1927, P. L. 886. That act repeals specifically the Acts of June 12, 1919, P. L. 451, June 30, 1919, P. L. 678, last amended by Act of April 27, 1925, P. L. 254; May 24,

1923, P. L. 425, as amended by Act of April 27, 1925, P. L. 286; March 31, 1921, P. L. 78, May 21, 1923, P. L. 291, March 23, 1921, P. L. 42, as amended by Act of June 14, 1923, P. L. 775. Then, in order that the destruction might be complete, it contains the general clause: "And all other acts or parts of acts inconsistent herewith shall be and the same are hereby repealed." It went into effect Jan. 1, 1928. The specific provisions of "The Vehicle Code" applicable to this case are the following sections: Sections 1033 and 1035, which are as follows:

"Local authorities, except as expressly authorized by this act, shall have no power or authority to alter any speed limitations declared in this act, or to enact or enforce any ordinance, rule or regulation contrary to the provisions of this act, except that local authorities shall have power to provide by ordinance for the regulation of traffic, by means of traffic officers or semaphores or other signaling devices, on any portion of the highway where traffic is heavy or continuous, and may regulate or prohibit parking, or prohibit other than one-way traffic, upon certain highways, and may regulate the use of the highways by processions or assemblages."

"Operators of motor-vehicles shall have the same right upon the highways as the drivers of other vehicles, and no highway, open to other vehicles, shall be closed to motor-vehicles." Vehicles, motor-vehicles and motor-omnibusses are all defined in the beginning of the act.

Sections 1033 and 1035 are as broad as it is possible to make them in declarations of the rights of operators on streets and as to the power of local authorities to legislate affecting the use of the highways. It is true that the Clark Act and the amendments to it are broad enough to confer authority on cities of the third class, but there is nothing in the conference of power on any city of the third class that would prevent the taking away of that same power. In Com. v. Moir, 199 Pa. 534, the syllabus is: "Municipal corporations are agents of the State, invested with certain subordinate governmental functions for reasons of convenience and public policy. They are created, governed and the extent of their powers determined by the legislature, and subject to change, repeal or total abolition at its will. They have no vested rights in their offices, their charters, their corporate powers, or even their corporate existence. The mere fact that the action of the State towards its municipal agents may be unwise, unjust, oppressive or violative of the natural or political rights of their citizens is not one which can be made the basis of action by the judiciary, nor are the motives of the legislators, real or supposed, in enacting legislation as to municipal corporations, open to judicial inquiry or consideration." In Kraus v. Philadelphia, 265 Pa. 425, the syllabus is: "The legislature may at any time modify or abolish the powers vested by it in the municipalities of the State. Unfinished proceedings of a municipality ordinarily fall with the repeal of the laws under which they were begun. . . . Where the legislature declares that it shall be unlawful thereafter for a municipality to do a given thing, it cannot thereafter be done, no matter how far the proceedings leading up thereto had advanced when the act went into effect." That an ordinance of a city may be blotted out by subsequent legislation is, therefore, apparent. That it was the legislative intent to do the very thing with respect to the routing of certain streets, as was done in the traffic rules or regulations cited above, appears from the Act of April 27, 1925, P. L. 254, which amended the 28th section of the Act of June 30, 1919, P. L. 678. The original Act of 1919 provided as follows: "Provided, that any city may regulate the transportation by motor-vehicles of passengers for pay within the limits of such city or from points in the city

to points beyond the city limits, and make and enforce regulations for the operation of such vehicles, not inconsistent with this act, and designate certain streets upon which such vehicles may be operated." The amended act retained the same provisions, and referred to "rules or regulations made by the police authorities under the authority thereof." The fact that the present ordinance was adopted in 1919 makes no difference. If there was nothing else in the way, the traffic rules or regulations could be enforced under the provisions of the above Acts of 1919 and 1925. However, when the Vehicle Code of 1927 was passed, the legislative thought, whether as a result of experience or of deliberation, changed that act, deliberately eliminating the above, and used the comprehensive terms expressed in sections 1033 and 1035, and the legislature went further and, as we showed above, specifically repealed the Act of 1919 and also the Act of 1925, *supra*. A declaration of legislative intent could not be plainer, whatever the reason may have been. That it had authority to do so is unquestioned. The reasoning applicable to the present case is illustrated by a consideration of the opinion of Judge Keller in White Line Taxi and Transfer Co. *v.* South Brownsville Borough, 91 Pa. Superior Ct. 46, which case was affirmed in 291 Pa. 478, and it will be noted that this latter case overrules Applewold Borough *v.* Dosch, 239 Pa. 479, which was a reversal of the same case in 51 Pa. Superior Ct. 152. The Vehicle Code of 1927, therefore, repeals all motor acts previously enacted, and it prevents any municipality from enacting any ordinance inconsistent with its provisions, and the traffic rules or regulations in Exhibit "B," therefore, fall. In our view, a very serious question would arise: Conceding that the Department of Public Affairs had authority to make rules or regulations "as emergencies or extraordinary conditions may require or warrant," are the rules or regulations above given justified under the circumstances of this case? Emergencies or extraordinary conditions are well understood. These rules, on their face, are not enacted for emergencies or extraordinary conditions. It does not appear when they were promulgated, but they were to go into effect on or after March 1, 1928, and were intended to be in force until changed or revoked. In other words, they were permanent rules or regulations, and the ordinance gave no such power to the Department of Public Affairs. When the clause just referred to is considered in connection with the first clause of the section, it will be seen that the subject-matter of the section is the parking of cars, which is prohibited within safety zones. Then the section goes on to say that the Department of Public Affairs is hereby authorized to make any such *additional* rules, &c. The plain construction of the section as a whole limits the authority of the department to additional rules on the subject of parking within safety zones. The interpretation adopted in the present instance is entirely too broad, and when the department undertook to define bus routes, &c., even section 19 will not support it.

It is not necessary to pass on the question whether the City of Easton has power to delegate its authority to the Department of Public Affairs. It was expressly stated upon the argument that there was no suggestion that the mayor had acted from prejudice or animosity. It was conceded that he was trying to extricate the city from a difficult position caused by congestion on the public highways. Nor do we think that the ordinance is discriminatory. The general subject of discriminatory ordinances is thoroughly discussed by Mr. Justice Kephart in the late case of White's Appeal, 287 Pa. 259, and by Mr. Justice Frazer in the late case of Bothwell *v.* York City, 291 Pa. 363. In the latter case, the syllabus is: "Discriminations open to objection are those where persons engaged in the same business are subjected to different restric-

tions or held entitled to different privileges under the same conditions." In the present case, there is nothing in the bill which would show how the plaintiffs are discriminated against. The mere fact that the Philadelphia Rapid Transit Line has a different route from those assigned to the plaintiffs cannot be said to be a discrimination. We think, as we stated above, that the two cases first cited would compel us to sustain the ordinance and regulations if limited to the plain purpose of section 19 were it not for the Vehicle Code of 1927. The learned counsel for the defendants insists that this case is ruled by City of Easton v. Miller, 265 Pa. 25. We do not think so. That case was cited in Valley Railways v. Harrisburg et al., 280 Pa. 385, a case utterly unlike the present case, but Mr. Justice Walling summed up what was held in the Miller case as follows: "That case did not attempt to exclude the railway company from any part of its chartered route, but merely required the railway company, in place of passing around the circle at the centre of the city to the left, to follow the current of traffic and pass around to the right—a reasonable regulation." Nor is there anything in Jitney Bus Ass'n of Wilkes-Barre v. City of Wilkes-Barre, 256 Pa. 462, that throws light on the present question. In that case, "the provisions of the ordinance (1) requiring the operators of jitneys to carry policemen and firemen free under certain conditions; (2) restricting the sureties upon a bond to surety companies; and (3) requiring that the bond should be a continuing liability, notwithstanding recovery thereon, are unreasonable and unenforceable." The discussion was interesting, but it is not applicable to the present case.

The prayer for relief, considered with respect to the position of the plaintiffs, as stated upon the argument but not made a matter of record, should be granted, as tested by the general provisions of sections 1033 and 1035, quoted *supra*, even though we have decided herein that the ordinance does not apply and that the interpretation put upon section 19 is too broad. That is to say, this being an equitable proceeding, we have a right to assume that the city may hereafter pass an ordinance that will conform to the powers granted by section 1033. They are (1) the regulation of traffic by means of traffic officers or semaphores or other signaling devices; . . . (2) may regulate or prohibit parking; (3) [may] prohibit other than one-way traffic upon certain highways; (4) may regulate the use of the highways by processions or assemblages. The plaintiffs object to the first provision of Exhibit "B," as follows: "There will be no interurban bus stops in the city limits." That provision could not be sustained. Section 1035 gives the plaintiffs the same rights on the highways as the drivers of other vehicles. They also object to provision No. 3, as follows: "No interurban busses permitted more than fifteen minutes at terminal stops for loading and unloading." That provision means that plaintiffs' vehicles cannot be parked for longer than fifteen minutes. It could be sustained under section 1033, and will not be covered in the decree. The same thing applies to provision No. 5.

'And now, March 12, 1928, this cause came on to be heard at this term by the court, and upon consideration thereof it is ordered, adjudged and decreed that the injunction heretofore granted be made permanent, and a perpetual injunction be issued to the City of Easton and Samuel S. Horn, Mayor, commanding and restraining them and each of them from interfering with, limiting or prohibiting the plaintiffs, and each of them, from using the streets and highways of the City of Easton, which are open and traveled upon by vehicles, and from limiting or designating the places where the plaintiffs' vehicles may stop for the purpose of loading and unloading passengers in the City of Easton.

It is further ordered and decreed that the defendants shall pay the costs of this proceeding. The prothonotary will enter this decree *"nisi"* and give notice of same to the parties or their counsel of record, and if no exceptions are filed within ten days after notice, this decree shall be entered by him as a final decree as of course.

From Henry D. Maxwell, Easton, Pa.